THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL GALLO, Defendant-Appellant.

First District (5th Division)   No. 1—91—3768

Opinion filed March 18, 1994.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and Michael Golden, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a bench trial, defendant Carl Gallo was found guilty of murder and sentenced to 75 years' imprisonment. Defendant appeals both his conviction and sentence.

Deloris Carroll testified at trial that her daughter Sheila married defendant in 1987, and Sheila and defendant had a daughter named Angela. In March of 1988, defendant and Sheila separated and Sheila and Angela moved into Ms. Carroll's house. On several occasions, defendant entered the house without permission. In May 1988, Sheila obtained an order of protection against defendant. Sheila worked the 11-to-5 shift at the Golden Ox restaurant in Chicago, Illinois. Sheila would call her mother to let her know when she was coming home from work and Ms. Carroll would put on the yard light and wait to make sure Sheila arrived home safely. Ms. Carroll stated that every night when Sheila came home from work, defendant was waiting for her on the front porch. According to Ms. Carroll, both Sheila and defendant had long flashlights.

Ms. Carroll testified that on August 3, 1989, Sheila was scheduled to appear in court for a divorce hearing. Defendant came to her house and offered to take Sheila to court. Sheila declined the offer and instead took a train. When Ms. Carroll came home around 5 p.m. that day, defendant was cutting the grass and Sheila was helping. Sheila told her mother that she got the divorce. Ms. Carroll asked Sheila why defendant was always at their house. Sheila responded, "He just comes over." Sheila and defendant ordered a pizza, stayed in the living room watching television, and never went upstairs.

Ms. Carroll further testified that on August 4, 1989, Sheila went to work at 4 p.m. Defendant came to Ms. Carroll's house at 8 p.m. to pick up Angela for the weekend. At about 10:45 or 11 p.m., Ms. Carroll heard the bell ring three or four times. Ms. Carroll stated that she knew it was defendant although she did not answer the door. Ms.

Carroll went to bed around midnight or 12:30 a.m. She locked the doors and turned on the air conditioner which was near the head of her bed. The door to her room was closed.

Ms. Carroll testified that at about 6 or 6:15 a.m. on August 5, 1989, she went to Sheila's bedroom to turn off the air conditioner. When she entered Sheila's room, she saw that a flashlight had been shoved inside Sheila's body. Ms. Carroll called her son, who came over, took Sheila's pulse and told his mother to call the police.

Ms. Carroll testified that Sheila had received cards and flowers from defendant. One card read, "Always. No divorce, Hugs and kisses, Carl." Another card read, "We have a real love hate relationship. I love it when we're together. I hate it when we're not. Love, Carl Junior." On Sheila's calendar, defendant wrote, "Don't do it. I love you. Carl Junior." According to Ms. Carroll, defendant was always hanging around Sheila and Sheila received continuous calls from defendant.

Officer O'Connor testified that he and Officer Davie went to Ms. Carroll's home on August 5, 1989. When he entered Sheila's room, Officer O'Conner saw blood and marks on Sheila's neck and a flashlight protruding out of Sheila's rectum. After getting permission from the medical examiner's office, O'Connor removed the flashlight from Sheila's rectum.

Officers Marchese and Cloonan testified that on August 5, 1989, they went to an address on Wakefield Drive where they saw two cars in the driveway. One of the cars, a black Buick Grand National, had heat coming from the front of the car. There was rain on the car, but the windshield was clean.

Officers Marchese and Cloonan then attempted to locate defendant. Defendant's father gave the officers permission to enter the house. Defendant's father told defendant that the police were there. Defendant got out of bed and put on a T shirt. The officers did not tell defendant that Sheila was dead, but asked defendant if he would accompany police for an investigation, and defendant agreed.

Officer Sanders testified that at 9:15 a.m. on August 5, 1989, he spoke with defendant at the police station. After being advised of his *Miranda* rights, defendant gave the police a statement. Defendant told the police that on August 4, 1989, defendant met with Sheila at a tavern called Doc Weeds. Defendant and Sheila spent two or three hours there dancing and drinking. At about 12:30 a.m., they left the bar. Defendant followed Sheila home and escorted her into the house. Defendant stated that he was driving a borrowed black Buick. Sheila asked defendant to look at a leak in the dining room ceiling. Defendant took off the ceiling panel. After using the downstairs bathroom,

defendant went upstairs and said goodnight to Sheila. Defendant arrived home around 1:30 a.m. No one was awake at defendant's house. Defendant stated that he then got undressed and put his clothes in the washing machine. Defendant stated that he needed socks because he needed to take the baby to the doctor in the morning. Defendant woke up around 7:15 a.m. and 10 minutes later, the police arrived.

According to Officer Sanders, when defendant was informed that Sheila had been murdered, defendant had no reaction. Defendant denied killing Sheila. Defendant stated that the only reason Sheila divorced him was to teach him some responsibility. Defendant asserted that after leaving the Daley Center on August 3, he and Sheila made love on the living room couch in Ms. Carroll's house. Ms. Carroll came home and cooked dinner for everybody. Later that night, defendant and Sheila again made love on the living room couch.

Officer Sanders stated that defendant admitted he had been arrested for violating the protective order. Defendant also admitted that he had previously entered Ms. Carroll's house through a window and that one time he kicked in the front door. After being told that witnesses saw him at the Golden Ox restaurant on the night of August 4, 1989, defendant admitted that he had gone to the Golden Ox and Sheila's home looking for Sheila. Defendant told Detective Sanders that he did not have sex with Sheila on the night of August 4. Detective Sanders testified he noticed small scratches on the back of defendant's hand.

John Distefano testified that he had known defendant for three to four years. In August 1989, Distefano loaned defendant his 1987 black Buick and during that time, defendant had the only set of keys to the car. Defendant had possession of the car on August 4, 1989.

Michael Anderson testified that he was the assistant head of security at Doc Weeds Tavern. Anderson knew Sheila for three or four months. On August 4, 1989, Sheila came to the tavern around 10 or 10:30 p.m. Anderson talked to Sheila for 10 minutes. Anderson stated that defendant entered the tavern about 15 minutes later. Anderson did not see defendant speak to Sheila but also admitted that, after talking to Sheila, Anderson did not see Sheila the rest of the night and did not know when Sheila left. In July 1989, Anderson saw defendant with Sheila. After seeing a doorman speak to Sheila, the doorman asked Anderson to ask defendant to leave Sheila alone.

Beth Marie Beil testified that she lived on the same block as Sheila and worked at Beil's bakery on the corner. Beil stated that she knew defendant from sight and in April or May of 1989, she saw

defendant sitting on the grass, shining a big flashlight. Later that evening, Beil saw a beam of light shining on the side of Sheila's house. Beil also testified that one time when Sheila visited the bakery, Sheila received a phone call which made her angry and tense.

Barbara Scalzitti, a worker at the Golden Ox, testified that she knew Sheila and knew that Sheila was going through a divorce. Scalzitti testified that on August 4, 1989, Sheila left the restaurant between 10:30 and 11 p.m. Defendant came by at around 11 p.m. to pick Sheila up, but Sheila had already left.

Louis Palli, a bartender at the Golden Ox, testified that he knew Sheila for six to nine months. When Sheila would close the restaurant, Palli would walk Sheila to her car. On each of the three or four times Palli walked Sheila to her car, Palli saw defendant around the car. Palli stated that on August 4, 1989, he walked Sheila to her car.

Attorney Steven Blum testified that he was Sheila's divorce lawyer. He stated that defendant filed for separation and Sheila filed for divorce. On August 3, 1989, at 2 p.m., defendant and Sheila testified at a contested divorce hearing. Blum had asked the judge for additional mediation, but the judge had refused it. The judge stated that once a written judgment was prepared and submitted to the court, he would enter a judgment of dissolution of marriage. Attorney Blum left the building with Sheila. Before leaving the Daley Center, Sheila thanked Blum, hugged him, and said she was very happy.

Medical examiner Michael Chambliss testified that he examined Sheila's body. There were injuries to Sheila's neck, vaginal and anal areas. There was also an abrasion on Sheila's left breast. Dr. Chambliss stated his opinion that Sheila died aa a result of manual strangulation with a possible contributing factor being impalement of the rectum. Dr. Chambliss stated that all Sheila's injuries were recent. Dr. Chambliss testified that the injuries could be classified as ante mortem, post mortem, or peri mortem. Dr. Chambliss stated the injury to the rectum could have been ante mortem or peri mortem, peri mortem being defined as having been committed around time of death.

Forensic dentist John Kenny testified that he examined the abrasion found on Sheila's breast. Dr. Kenny took impressions of the bite mark on the breast and took dental impressions of defendant. Noting significant points of comparison, Dr. Kenny concluded that defendant's teeth matched the bite mark. Dr. Kenny noted that the bite mark was upside down. Dr. Kenny stated that he "fe[lt] comfortable in saying these injuries were inflicted at or about the same time the neck injuries occurred" since they are similar in appearance. Dr. Kenny concluded that the injuries to the nipple

were peri mortem. Dr. Kenny noted that his report did not state his opinion as to when the injury occurred.

Processing technician O'Connor testified that on August 5, 1989, he processed the crime scene and noted that a ceiling tile was missing from the breakfast nook area. O'Connor saw no signs of forced entry. O'Connor later went to defendant's home, where he recovered a pair of jeans and a shirt from the washing machine. O'Connor stated that he did not recover any socks from the washing machine.

Serologist Cristine Braum testified that on August 5, 1989, she examined a pair of jeans and a shirt and found no blood on the clothing. Preliminary tests on swabs taken from defendant's hands yielded positive results for blood, but there was an insufficient quantity to do any further testing. A fingernail clipping taken from defendant tested positive for blood.

The State recalled Dr. Chambliss, who testified that from the appearance of the injuries to the neck and breast, they were caused within the same time frame and were almost contemporaneous. Based upon the coloration of the skin, Dr. Chambliss opined that the breast injury was ante mortem. Dr. Chambliss did state that the tissue around the nipple had a different component beneath the skin surface and that the breast would react differently than the remaining skin.

The court then examined Dr. Chambliss, and Dr. Chambliss reiterated his opinion, based upon the nipple's gross appearance, that the injury to the breast was ante mortem. Although an ante mortem injury could be incurred anywhere from birth to death, the doctor opined that because of the absence of scabbing or healing, the abrasion to Sheila's breast would fall in the category of recent ante mortem. Recent ante mortem injuries were those incurred within 24 hours of death.

The trial court found defendant guilty of murder and sentenced him to an extended term of 75 years' imprisonment. Defendant raises the following issues on appeal: (1) whether defendant was found guilty beyond a reasonable doubt; (2) whether the trial court improperly assumed the role of the prosecutor; and (3) whether the trial court considered improper factors in aggravation when sentencing defendant.

Defendant's first contention is that the State failed to prove defendant guilty beyond a reasonable doubt since the State failed to prove that the bite mark on Sheila's breast occurred at the same time as Sheila's death. Defendant claims that the evidence showed only that defendant administered the bite mark on Sheila's breast within 24 hours before the murder. Defendant claims that the bite

mark occurred during consensual sex between defendant and Sheila that took place sometime within that 24-hour period.

The relevant inquiry here is whether, after viewing the evidence in the light most favorable to the prosection, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781; *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) Our review of the record reveals that the trial court had sufficient basis for finding defendant guilty beyond a reasonable doubt.

■ Dr. Kenny, an expert in forensic dentistry, gave his opinion that the injury to Sheila's breast was caused by human teeth and that it was defendant's teeth that made the teeth mark. Dr. Kenny further testified that the injuries to Sheila's breast and neck were approximately the same age and were inflicted within the same time frame.

Dr. Chambliss, a medical examiner, testified that the injuries to Sheila's body were ante mortem or peri mortem in nature. He stated his opinion that all Sheila's injuries were recent and that the injuries to the neck and breast were caused within the same time frame and were almost contemporaneous. It was therefore reasonable for the trier of fact to conclude that defendant caused the injury to Sheila's breast at the same time as he caused the injury to her neck.

The bite mark was not, contrary to defendant's assertion, the only evidence the court could have relied upon in finding defendant guilty. Facts provided by defendant in his statement to police were contradicted by witness testimony at trial. In his statement, defendant claimed that he had been asleep until 10 minutes before the police arrived at his house on August 5. However, officers testified that when they arrived at defendant's house, defendant's borrowed car was wet, but his windshield was clean. The officers also noted that the engine of the car was warm. Furthermore, although defendant told police that the reason his clothes from the evening of August 4 were in the wash was because he needed socks for the next morning, the washing machine contained only blue jeans and a shirt, not socks. Blood was found on samples of defendant's fingernails and swabs taken from defendant's hands. Sheila's co-workers and family members testified that defendant was consistently calling, visiting and harassing Sheila. When the police told defendant that Sheila had been killed, defendant had no reaction. In addition, defendant and Ms. Carroll provided different versions of what occurred between defendant and Sheila the day before her murder. The trial court was in the best position to judge the credibility of the witnesses and

determine the weight to be accorded their testimony, and we believe the trial court had before it sufficient evidence to find defendant guilty beyond a reasonable doubt.

Defendant next contends that he was denied a fair trial because the trial judge assumed the role of the prosecutor. Defendant claims that during an in-chambers scheduling conference, the trial judge told the parties that he did not believe the State had proven its case beyond a reasonable doubt and that if the State did not recall Dr. Chambliss the judge would recall him. The trial judge adamantly denied making the statement that the State had not proved its case beyond a reasonable doubt. The trial judge explained that he only wanted Dr. Chambliss recalled because the judge needed some clarification as to Dr. Chambliss' testimony of when the bite mark was made and, specifically, what Dr. Chambliss meant by "recent ante mortem."

■ Defendant and the trial judge recall the statements made by the trial judge during the in-chambers conference differently. For some reason, the parties chose not to have the in-chambers discussion reported. Had a court reporter been present during this conference, we could easily resolve the dispute as to what was in fact said by the trial judge. Defendant had an obligation to present a record to show his right to relief and any doubt arising from the incompleteness of the record will be resolved against the defendant. (See *Sandberg v. American Machining Co.* (1975), 31 Ill. App. 3d 449, 334 N.E.2d 246.) We therefore presume that the trial judge never commented that the State had failed to prove its case beyond a reasonable doubt.

The trial judge stated that Dr. Chambliss needed to be recalled in order to clarify what he meant when he stated that Sheila's injuries were recent. A trial judge has the right to question witnesses in order to elicit the truth, bring enlightenment on material issues which seem obscure or to clarify ambiguities in the witness' testimony. (*People v. Palmer* (1963), 27 Ill. 2d 311, 189 N.E.2d 265; *People v. Rogers* (1974), 18 Ill. App. 3d 940, 310 N.E.2d 854.) The propriety of such examinations must be determined by the circumstances of each case and rests largely within the discretion of the trial court. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) This is especially true where the case is being tried without a jury and the danger of prejudice is lessened. (*Palmer*, 27 Ill. 2d at 315.) The discretion of the trial judge is not, however, unlimited, and the judge is required to be fair and impartial. *People v. Cofield* (1973), 9 Ill. App. 3d 1048, 293 N.E.2d 692.

We are not persuaded by the cases cited by defendant in support of his argument that the trial judge assumed the role of the

prosecutor when he required that Dr. Chambliss be recalled, and then questioned Dr. Chambliss. In *People v. Cofield* (1973), 9 Ill. App. 3d 1048, 293 N.E.2d 692, the trial judge called nearly all of the State's witnesses and conducted extensive examinations of the witnesses, asking them questions directed at eliciting testimony to support the allegations against defendant. The trial judge in the instant case asked that only one witness be recalled and did not seek testimony against defendant, but merely sought limited testimony to clarify an ambiguity in Dr. Chambliss' prior testimony.

In *People v. McGrath* (1967), 80 Ill. App. 2d 229, 224 N.E.2d 660, the trial judge proved up venue for the State and all the testimony of the complaining witness against the defendant was brought out by the court's questioning. In the instant case, the trial judge did not seek to prove anything, he merely attempted to clarify a point he found ambiguous.

In *People v. Moriarity* (1966), 33 Ill. 2d 606, 213 N.E.2d 516, each time a witness identified defendant, the trial judge took over the questioning and emphasized the identification. While defense counsel was cross-examining witnesses, the court supplied its own objections to questions asked. In addition, the trial judge made comments from which the jury could not help but know that the judge thought little of defense counsel or the merits of the defense. The judge's actions in *Moriarity* clearly prejudiced defendant in the eyes of the jury. The instant case was not tried before a jury and the trial judge remained fair and impartial. Therefore, we find no merit to defendant's contention that the trial judge assumed the role of the prosecutor.

Defendant's last contention is that his sentence should be reduced or the cause remanded for a new sentencing hearing because the court considered defendant's alcohol and cocaine use in aggravation. The State claims that defendant waived this issue because he failed to raise it at sentencing and failed to file a motion to reduce or reconsider his sentence. That is not the rule applied in this district. (See *People v. Moss* (1993), 260 Ill. App. 3d 272; *People v. Gomez* (1993), 247 Ill. App. 3d 68, 617 N.E.2d 320.) Furthermore, this issue is now pending before the Illinois Supreme Court in *People v. Lewis* (1992), 235 Ill. App. 3d 1003, 602 N.E.2d 492, *appeal granted* (1993), 148 Ill. 2d 649, 610 N.E.2d 1271, and until it is resolved, we will not apply the waiver rule.

The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, a sentence may not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Our review of the record reveals no abuse of discretion. The trial court's general comments regarding alcohol and drugs often leading

to violent behavior do not lead us to conclude that the trial court "improperly penalized defendant for the harmful effects of cocaine and alcohol and imposed an increased sentence." The court stated that, in reaching its decision, it considered the factors presented in aggravation and mitigation. After reviewing those factors, it is clear that the court had ample justification for imposing upon defendant an extended-term sentence.

■ At the sentencing hearing, the State presented the court with testimony from several police officers regarding defendant's harassment of Sheila and his repeated violations of the order of protection. According to these officers, defendant would often go to Sheila's house and harass her, and would leave threatening messages on Sheila's telephone answering machine. Defendant would follow Sheila, bang and kick at her door, and enter Sheila's house through a window. Officers had observed Sheila bruised and swollen after being beaten by defendant. As a result of these instances, defendant had pled guilty on two occasions and was found guilty on one occasion of violating the order of protection. Defendant had twice pled guilty to battery.

The court also had for its review several victim impact statements and a transcript of Sheila's testimony during her divorce proceedings, which included Sheila's testimony as to how defendant physically abused her two days after they got married and how defendant's abuse continued throughout Sheila's pregnancy. Furthermore, in imposing sentence, the trial court was clearly influenced by the vicious manner in which this murder was committed. The trial court found that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. We therefore conclude that the trial court did not abuse its discretion in sentencing defendant to an extended term.

Accordingly, for the reasons set forth above, defendant's conviction and sentence are affirmed.

Affirmed.

MURRAY, P.J., and COUSINS, J., concur.