*In re* CHRISTOPHER MAHER, a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Christopher Maher, Respondent-Appellant).

Fourth District   No. 4—99—0241.

Argued September 22, 1999.—Opinion filed July 21, 2000.

KNECHT, J., dissenting.

Jeff M. Plesko, of Guardianship & Advocacy Commission, of Anna, and William J. Conroy, Jr., (argued) of Guardianship & Advocacy Commission, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE COOK delivered the opinion of the court:
In March 1999, the trial court found respondent, Christopher Ma-

her, subject to involuntary admission to a mental health facility. Respondent appeals, arguing that (1) the trial court questioned a witness in chambers *ex parte* and then called the witness to testify, becoming an advocate for the State and depriving him of a fair trial, (2) the trial court misapplied the standard of proof and placed the burden of proof on respondent, (3) the State failed to prove by clear and convincing evidence he was subject to involuntary commitment, (4) his commitment was not in compliance with the emergency-admission-by-certificate procedures of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3—600 *et seq.* (West 1998)), and multiple procedural deficiencies occurred in transferring him to the mental health center. We affirm.

## I. BACKGROUND

On March 16, 1999, a petition for emergency admission by certificate was filed by a crisis therapist pursuant to section 3—601 of the Mental Health Code (405 ILCS 5/3—601 (West 1998)) on the grounds respondent was mentally ill and, because of his illness, was reasonably expected to inflict serious physical harm on himself or another in the near future. Two certificates supporting the petition were prepared and filed that day. The certificates were prepared by an emergency room physician at BroMenn Hospital and by Dr. Robert Scott Hamilton, a psychiatrist. The certificates contained allegations respondent had barricaded or "isolated" himself in his room at his parents' house and threatened his parents.

A hearing on the petition took place on March 19. Stephen Maher, respondent's father, testified respondent began engaging in "aberrant behavior" as an adolescent. Respondent verbally harassed and physically abused his younger brothers and sister "beyond that which might have been expected of *** an adolescent." In 1977, Stephen and his wife obtained counseling for respondent and the family. The counselor diagnosed respondent with "passive-aggressive disorder." Counseling was discontinued after several months because respondent was uncooperative.

Stephen stated respondent continued to engage in violent behavior, such as breaking items, kicking doors, and beating his brothers and sister. At one time Stephen attempted to pull respondent away from his brother, who was eight years younger than respondent, and respondent struck a blow to Stephen's forehead, breaking his eyeglasses. On another occasion, Stephen's daughter called him at work because respondent had been "violent to her" and, when Stephen returned home, he found respondent had cut his sister's hand with a knife.

Respondent abused alcohol, drove his car through the family's

yard and verbally abused his family with "loud and distasteful language." Stephen testified respondent was convicted of either aggravated assault or aggravated battery for assaulting a video store clerk who tried to detain him when he stole some merchandise. Respondent was also convicted of multiple incidents of driving under the influence of alcohol and driving while license revoked, spending periods of incarceration in the county jail. He was found to be unfit to stand trial in a criminal case and hospitalized for several months until he was found to be fit. A psychologist who evaluated respondent at that time diagnosed him with organic brain disorder induced by drug abuse as opposed to head trauma. At that time, respondent was using cannabis, lysergic acid diethylamide (LSD), and cocaine. Respondent was convicted and sentenced to four years in the correctional facility at Dixon but only served six months.

Stephen and his wife enrolled respondent in a substance-abuse rehabilitation program at Lutheran General Hospital, but respondent did not successfully complete treatment. He did later stop using cocaine on his own and had abstained from alcohol for nine years.

While living with his parents from 1993 through March 1998, respondent obtained a psychiatric evaluation in which he was diagnosed with bipolar disorder (manic-depressive disorder) and schizophrenia. Respondent received counseling and medication and obtained employment as a cook and a janitor. His behavior improved although he had occasional "outbursts." In March 1998, respondent moved to Milwaukee. There he continued treatment with Dr. Bott, a psychiatrist who prescribed Thorazine and Cogentin. Stephen was aware respondent was not taking his medication in the quantity Dr. Bott prescribed. Dr. Bott told Stephen he did not really have a diagnosis for respondent's disorder but was treating him according to his "basic regimen" for a patient with personality disorders.

On March 7, 1999, respondent returned to his parents' Bloomington residence. Respondent was upset the family dog died and wanted to know who had killed the dog and if he had been poisoned. Stephen told respondent the dog died a natural death, but the dog had actually been euthanized. In the evening hours of March 15, Stephen asked respondent to leave the room because he was directing foul remarks to his mother, who was in a great deal of pain from a broken arm. Respondent began talking about the dog and warned Stephen, "Satan is going to get you folks."

Stephen told respondent he was going to get counseling for him. Respondent threatened to load his 30-30 and his 9 millimeter gun and "blow away" anyone that walked through the door. Stephen knew a .25-caliber handgun and a 30-30 were chained to a steel support pole

in the basement. He thought respondent had a key to the lock. Stephen never saw a 9 millimeter gun, but he had a receipt he thought represented a down payment for such a weapon. Then he stated, "It does not mean that one exist [sic]."

With his wife locked in the master bedroom, Stephen left for the crisis center because he was afraid to telephone for help from his residence. The crisis team suggested police intervention. When Stephen returned home, his wife was frightened because she thought she heard a gun being cocked. Stephen and his wife left the house immediately. Neither of them was physically harmed during the episode.

Detective Clay Wheeler was called in as a police negotiator at about 8 p.m. on March 15, 1999, for what he was told was a barricaded subject possibly holding hostages. He telephoned the Maher residence, but respondent would not initially answer the phone. Wheeler left about eight messages on the answering machine before respondent called him back about 30 minutes later. Wheeler talked with respondent for about an hour. Respondent told him Stephen was to blame for the incident because he was intoxicated and had ridiculed respondent. Respondent mentioned his dog of 14 years had died. He also stated if his parents were dead he "would tear [his sister] apart." Wheeler tried to convince respondent to meet with him face to face, but respondent refused. Wheeler told respondent he knew about the threats respondent made toward his parents and the police needed to come into the house. Respondent admitted to Wheeler guns were in the house.

After about an hour, respondent said he was tired and going to bed, and he hung up the phone. Wheeler did not get any response to about 27 more telephone calls to the house.

Officers tried to talk with respondent over a megaphone until respondent talked to Wheeler a second time on the phone. This time, respondent said he "would take care of his Dad" if he lost his housing income and the "next time" the police came out "it would be a lot more of a problem to get him out of the house." Wheeler convinced respondent to surrender at 4:25 a.m. on March 16. Respondent did not resist the police when he walked out of the house. The officers entered the house and found the guns still secured in the basement.

Dr. Hamilton testified he was called in by the crisis team. Members of the crisis team as well as respondent's parents told him respondent "had threatened physical violence" and they were concerned respondent might have access to a gun. Dr. Hamilton first talked to respondent about 1 a.m. on March 16. After respondent was in custody, Dr. Hamilton learned respondent had not been armed, but the police negotiator told him respondent had threatened to "be violent with his

family, with his parents in particular," when he was discharged from the hospital.

Dr. Hamilton examined respondent later in the morning on March 16 after he was brought to BroMenn Hospital by the police. He prepared a history and physical report of respondent and relied upon a social service investigative report and dispositional report prepared by clinical social worker Calene Roberts. Roberts' report revealed respondent had a long psychiatric history with a diagnosis of schizophrenia and had been hospitalized at least once. He also had been hospitalized for substance abuse and had been incarcerated at the state correctional facility in Dixon. Respondent had been receiving outpatient treatment near Chicago just prior to the incident that caused the filing of this petition.

In the history gathered by Dr. Hamilton, respondent reported he is a recovering alcoholic, he occasionally used marijuana, and he received psychiatric care in Milwaukee, where he currently lived. Respondent also stated he sustained head trauma following a car accident and at times he hears voices and gets "somewhat paranoid." Respondent stated he had not been taking his prescribed medication, Trifluoperazine, for the past week because he could not afford the prescription.

Respondent told Dr. Hamilton everybody, particularly his family, told lies about him and anybody providing an account of the March 15 incident contrary to his was lying. Respondent believed "people were following him." He told Dr. Hamilton his father "set off" the incident on March 15 by demeaning him and his family "always harassed him." Respondent told Dr. Hamilton he came to Bloomington because he wanted his parents to help him move into a new apartment in Milwaukee.

Dr. Hamilton attempted to confer with respondent's treating psychiatrist, Dr. Bott, but could not reach him. Respondent told Dr. Hamilton he would "go nuts" if he were committed, which Dr. Hamilton interpreted to mean respondent would be "violent and disruptive."

Dr. Hamilton's initial diagnosis was organic personality syndrome due to a closed head trauma with psychosis and possible developmental delay. His dispositional report recommended long-term psychiatric hospitalization, followed by admission to a supervised or supportive living situation and outpatient treatment with a psychiatrist at a mental health clinic. Dr. Hamilton changed his diagnosis to paranoid schizophrenia after conferring with respondent's family and nurse Char Tyler.

Stephen Maher told Dr. Hamilton respondent's mental problems started long before his automobile accident and respondent had been

diagnosed by other professionals with passive-aggressive behavior disorder and paranoid schizophrenia, had engaged in physical violence in the past, and had been admitted previously to a mental hospital. Stephen also showed him a receipt for a 9 millimeter gun.

Dr. Hamilton obtained information from nurse Tyler that respondent stated he would "get" his parents if they did not give him money and take care of him and the police could not watch him 24 hours a day, 7 days a week. Respondent later explained he was not going to physically harm his parents but would "get them" some other way.

Dr. Hamilton stated a paranoid schizophrenic does not necessarily have paranoid delusions, but respondent did. He also explained most schizophrenics are not violent but several factors increase the risk of violence, such as substance abuse, noncompliance with taking medication, and a history of threats or engaging in violent behavior. All of these factors applied to respondent.

Dr. Hamilton stated both his original diagnosis and his current diagnosis would account for respondent's behavior. He believed respondent's mental condition was "more schizophrenic." Dr. Hamilton opined respondent was mentally ill and, because of his illness, he was reasonably expected to inflict physical harm on himself or another in the future. He recommended long-term hospitalization because of respondent's noncompliance with taking medication and his potential for violence. Anything less than hospitalization would be a potential danger for society and respondent.

Dr. Hamilton admitted on cross-examination that respondent's threats were verbal, and although guns were located in the house, respondent never had one in his hand. Dr. Hamilton admitted he may have assumed respondent threatened someone with a gun. He also admitted respondent did not appear to him to be violent, hostile, or aggressive at the time Dr. Hamilton signed the certificate.

The only evidence offered by respondent was a written letter to the trial judge, which was admitted into evidence. Respondent described the incident in question as an argument between himself and his father that got blown out of proportion by the police and later the media. He stated he told the police they could come into the house any time they wanted and he would never harm his parents. Respondent stated he knew right from wrong and was making a new life for himself in Wisconsin, where he had just obtained a new apartment.

Arguments by counsel followed. The trial court then expressed its concern about hospitalizing someone simply because he or she was unreasonable, belligerent, or even threatening unless the court believed the threatened behavior was likely to occur in the near future. The court found the testimony indicated respondent had mental problems

but found it to be contradictory and unclear on whether he had a mental illness or a personality disorder. The trial court expressed its frustration the only two options available were ordering hospitalization or letting respondent go. The judge wished someone could look after respondent if he let him go and queried where respondent would go if he were free.

Respondent's counsel then stated respondent told her he had employment with a landscaping firm in Milwaukee and had recently been accepted into a subsidized-living apartment. The trial court then asked if the parties objected if he "talked" to respondent's father, Stephen, in chambers. Counsel for the State replied, "No, sir," and respondent's counsel said, "I don't care."

The trial judge then took Stephen into his chambers for an *ex parte* conversation that was not recorded or transcribed. After the court's conversation with Stephen, the judge called Stephen back to the witness stand. The judge made a record that in chambers he inquired of Stephen what would happen if he gave respondent a bus ticket back to Milwaukee. He asked Stephen to tell the parties what he told the court in chambers. According to Stephen, respondent did not have an apartment because he had been evicted. He stated respondent had applied for subsidized housing, but Stephen had no proof respondent would get such housing. As for a job, Stephen stated there was "no absolute promise of work at this present time." There was "an indication" respondent could start work. Stephen stated that, although respondent did not have a place to go in Wisconsin, he was not welcome at his parents' home.

Stephen also told the trial court about a receipt for a gun, a 9 millimeter Ruger. The trial court asked Stephen to tell the parties what he had told the court. Stephen stated he had the receipt, which did not state the purchaser's name but noted a $25 down payment had been made on February 3. He stated he did not have the receipt with him but it represented a purchase made in Wisconsin.

On cross-examination by respondent's counsel, Stephen admitted he did not know whether respondent contacted Lutheran Social Service Agency in Wisconsin about placement in subsidized housing. Stephen did not know respondent had a business card from an agency representative indicating respondent's dealings with the agency. Stephen thought respondent could not take such steps on his own but would need Stephen's help, as he had in the past. Stephen stated respondent worked for the landscaping company on a temporary, as-needed basis the previous summer. The receipt for the gun purchase only indicated a down payment had been made and not that the gun was actually received.

When cross-examined by the State, Stephen stated respondent had repeatedly talked about the gun and that he needed it to protect himself from people who might enter his apartment. Further, respondent stated he would use the gun to stop the "authorities" from harassing him or, if times got really tough, he would use it to hold up places. Stephen helped respondent at times in the past to move to new apartments or obtain new housing. He had been to Milwaukee a few weeks before this incident to help respondent obtain subsidized housing as he was about to be evicted. When respondent came to Bloomington, he left all his personal property in Milwaukee. He told Stephen he had an appointment in Milwaukee set on the day of the hearing.

The trial judge indicated this was a borderline case where it was hard for him to know what to do. The court indicated its preference for sending respondent for further evaluation to see if he had a long psychiatric history, whether he really was schizophrenic, whether he was a danger to himself or others, with the court to receive a report in a couple of weeks. The judge noted he had nowhere to send respondent to have this evaluation and, therefore, found him to meet the statutory criteria and ordered him involuntarily admitted to the Zeller Mental Health Center. The judge then stated Zeller was required to provide a report to him in 30 days concerning the patient's needs. At that time, the trial court would decide whether to keep him for a longer period of time or "turn him loose."

The trial court entered a written order finding respondent was a person subject to involuntary admission and hospitalizing him for up to 180 days in the Department of Mental Health and Developmental Disabilities, finding that was the least-restrictive environment currently appropriate and available.

Respondent filed a timely notice of appeal on March 23. On April 15, 1999, a notice of change in status was filed with the court by the facility director of Zeller Mental Health Center, informing the court respondent had been discharged from the facility on April 12.

## II. ANALYSIS

Both parties contend this case is not moot, despite respondent's release from the Zeller Mental Health Center, based on an exception to the rule of mootness. Our supreme court has recognized where the case involves an event of short duration that is "capable of repetition, yet evading review," review may be had despite the issue otherwise being moot. *In re Barbara H.*, 183 Ill. 2d 482, 491, 702 N.E.2d 555, 559 (1998). To qualify for this exception, the challenged action must be too short in its duration to be fully litigated prior to cessation and the cause must present a reasonable expectation the same complain-

ing party would be subjected to the same action again. *Barbara H.*, 183 Ill. 2d at 491, 702 N.E.2d at 559. Both parties contend this case meets both criteria. For involuntary hospitalizations, the maximum term is 180 days, after which a new petition must be filed, a new hearing held, and a new order entered by the court. 405 ILCS 5/3—813 (West 1998). The commitment order expired in its entirety in this case prior to our review. Respondent had been released long before the expiration of the order.

Respondent does have a history of mental illness, and at least a brief history of prior involuntary hospitalization, so it is reasonable to expect the same action that was taken against him here might be undertaken again. We elect to address this appeal on the merits.

Respondent argues the trial court's *ex parte* conversation with a witness in chambers and then recalling him to testify to information gained in that conversation, thus supplying additional evidence for the State, was error requiring reversal of the trial court's order.

■ The State argues respondent has forfeited this issue due to his counsel's failure to object during the hearing and failure to raise this issue in a posttrial motion. See *In re Barnard*, 247 Ill. App. 3d 234, 252, 616 N.E.2d 714, 727 (1993). Application of the forfeiture rule is less rigid where the basis of the objection is the trial court's own conduct. *People v. Davis*, 185 Ill. 2d 317, 343, 706 N.E.2d 473, 485 (1998). Specifically, where the trial court departs from its role and becomes an advocate for the State's position, no objection by opposing counsel is necessary to preserve the issue for review. *People v. Rega*, 271 Ill. App. 3d 17, 24, 648 N.E.2d 130, 134 (1995); *People v. McGrath*, 80 Ill. App. 2d 229, 236, 224 N.E.2d 660, 664 (1967).

■ A trial court may, in its discretion, question witnesses to elicit the truth or clarify material issues that seem obscure as long as it does so in a fair and impartial manner. *People v. Smith*, 299 Ill. App. 3d 1056, 1062, 702 N.E.2d 218, 222 (1998). However, the trial court must not depart from its function as a judge and may not assume the role of an advocate for the State. *Smith*, 299 Ill. App. 3d at 1064, 702 N.E.2d at 223; *McGrath*, 80 Ill. App. 2d at 236, 224 N.E.2d at 664. The propriety of an examination of a witness by the trial court must be determined by the circumstances of each case and rests within the discretion of the trial court. *People v. Gallo*, 260 Ill. App. 3d 1032, 1039, 632 N.E.2d 99, 104 (1994).

■ Supreme Court Rule 63(A)(4)(c) provides a judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge. 155 Ill. 2d R. 63(A)(4)(c). Generally, private conversations with a judge concerning a pending case are improper. See *People v. Taylor*,

288 Ill. App. 3d 21, 27, 679 N.E.2d 847, 851 (1997). A trial judge has an obligation to assure the public that justice is administered fairly and must avoid the appearance of impropriety. *People v. Bradshaw,*. 171 Ill. App. 3d 971, 975-76, 525 N.E.2d 1098, 1101 (1988). While no reported case has been found dealing with a trial judge having *ex parte* communications with a witness during a trial, it has been held an administrative law judge should avoid *ex parte* communications with a testifying witness and reversal is required where actual prejudice to the complainant is shown. *Korunka v. Department of Children & Family Services*, 259 Ill. App. 3d 527, 530-31, 631 N.E.2d 759, 761 (1994).

■ The court acted out of a desire to do the right thing for respondent. It was concerned with the family problem the case presented and was grasping for a practical solution. Whether Stephen here fell within the language of Rule 63(A)(4)(c), which allows the court, with consent, to confer separately with parties and their attorneys, is unclear. Nevertheless, because respondent consented to the separate conference in this matter, we perceive no prejudice. We recommend that the court not engage in such conferences in the future absent compelling circumstances.

Once the *ex parte* conference was held, the court could appropriately call Stephen to the stand to make a record of what had been discussed. Likewise the court could appropriately question Stephen for the purpose of educating itself fully regarding the circumstances of this case, although a court that questions a witness must be careful not to appear as if it is acting as an advocate. The fact that the judge's questions brought out information damaging to respondent does not mean the judge was acting as an advocate.

We have examined the other issues advanced by respondent and decline to address them, as they are moot.

We affirm the judgment of the trial court.

Affirmed.

MYERSCOUGH, J., concurs.

JUSTICE KNECHT, dissenting:
I respectfully dissent.

In this case, the trial court abused its discretion and overstepped its bounds by conversing with Stephen Maher *ex parte*. The error was exacerbated because no court reporter was present. Prior to speaking with Stephen *ex parte* in chambers, the court was frustrated with the choices of disposition and opined *it was not yet* convinced as to which way it should rule.

Mental health cases are often frustrating. A trial judge with a sincere desire to solve or ameliorate a human problem may be sorely tempted to become a counselor or mediator. However, *ex parte* communication such as that which occurred here is improper no matter the benevolent motivation of the trial court. It is especially damaging when it occurs with the major complaining witness and a liberty interest is at stake. While my view of the trial judge's effort to resolve this case is charitable, what must the respondent have thought when he saw the chief witness against him being ushered to a private audience with the court? An *ex parte* conversation with the chief witness in a mental health case is akin to a trial judge having a private conversation with a victim in a criminal case. Such *ex parte* conversations should only occur on television or in films.

After the *ex parte* communication, the trial court compounded the error by recalling Stephen as a witness and not only questioning him concerning whether respondent had a place to live and a place to work in Milwaukee, but also questioning him about the actual existence of the 9 millimeter gun to which he had previously referred. The additional cross-examination of Stephen revealed new assertions respondent threatened to use the gun against authorities or to commit robberies. The State's case against respondent was significantly bolstered, and the trial judge apparently gleaned enough additional evidence to persuade him the respondent should be committed.

Supreme Court Rule 63(A)(4) clearly does not apply. Stephen Maher is not a party, and respondent did not consent to the conference.

The trial court's finding that respondent suffered from mental illness was not erroneous. However, the trial court's finding respondent was an immediate threat to harm either himself or others was not proved to the trial court's satisfaction *prior* to the additional testimony elicited by the court following the *ex parte* conversation. The trial court's *ex parte* conversation with Stephen and the ensuing testimony in open court prejudiced respondent. I would reverse the trial court's order involuntarily committing respondent.