2026  IL App (1st) 251751-U

FOURTH DIVISION
Order filed: June 11, 2026

No. 1-25-1751

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | |
|---|---|
| *In re* J.A., Jr., S.A., E.C., and A.A., Minors | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Cook County. |
| | ) |
| Petitioner-Appellee, | ) |
| | ) Nos. 23JA00413, |
| v. | ) 23JA00417, |
| | ) 23JA00418, |
| C.C., | ) 23JA00419 |
| | ) |
| Respondent-Appellant | ) |
| | ) |
| J.A., Sr. | ) Honorable |
| | ) Lisa M. Taylor, |
| Respondent-Appellee). | ) Judge, presiding. |

_____

JUSTICE QUISH delivered the judgment of the court.
Presiding Justice Navarro and Justice Ocasio concurred in the judgment.

¶ 1    *Held*:  In wardship proceedings under the Juvenile Court Act, the circuit court did not improperly deviate from its impartial role by questioning the case worker or prejudge the case and thus, the court's disposition order is affirmed.

¶ 2    Respondent C.C., the mother of J.A., Jr., S.A., E.C., and A.A. (collectively "the Minors"),

appeals from the circuit court's disposition orders returning the Minors to the care and custody of

their father, respondent J.A., Sr. and granting J.A., Sr.'s motions to return the Minors home to him. She contends that the circuit court's extensive questioning of the Minors' case worker and its statement after the completion of testimony at the dispositional hearing that it was inclined to rule in J.A., Sr.'s favor demonstrated bias against her. For the following reasons, we reject her arguments and affirm.[1]

¶ 3    On June 14, 2023, the State filed petitions for adjudication of wardship for each of the Minors under section 2-3 of the Juvenile Court Act ("Act") (705 ILCS 405/2-3 (West 2022)). In the petitions, the State alleged that the Minors were living with C.C. and were neglected because their environment was injurious to their welfare and abused because C.C. created a substantial risk of physical injury. Specifically, the State alleged that C.C. had two prior indicated reports for inadequate shelter and environmental neglect, has untreated mental health issues, and had not completed recommended services. The State also alleged that three of the Minors were discovered home alone without electricity in May 2023, there was an ongoing issue of domestic violence between C.C. and the putative father of one of C.C.'s other children, and there was an intact case opened in September 2022. The court appointed the Office of the Cook County Public Guardian ("Public Guardian") as attorney and guardian *ad litem* for the children, granted temporary custody of the Minors to the Department of Children and Family Services ("DCFS") Guardianship Administrator, and allowed the Minors to have supervised visits with C.C.

---

[1] This matter qualifies for an accelerated disposition under Illinois Supreme Court Rule 311(a) (eff. Jul. 1, 2018). Based on the date the notice of appeal was filed, a decision in this case was originally due on February 2, 2026. However, due to a protracted briefing process that involved multiple extensions of briefing deadlines, we find good cause to extend the disposition deadline. See Ill. S. Ct. R. 311(a)(5).

¶ 4     On June 20, 2023, the State amended its petitions and identified J.A., Sr. as the father of the Minors. On July 26, 2023, the court established J.A., Sr.'s paternity of the Minors and authorized DCFS to allow J.A., Sr. to have unsupervised visits.

¶ 5     On October 21, 2024, following an adjudicatory hearing, the court adjudicated the Minors abused or neglected due to an injurious environment and a substantial risk of physical injury, with C.C. and her boyfriend identified as the perpetrators. The court also adjudicated the Minors wards of the court, found C.C. unable and unwilling to care for the Minors, found J.A., Sr. unable to care for the Minors, and authorized the DCFS Guardianship Administrator to place the Minors. The court also granted J.A., Sr. unsupervised overnight visitation. The court set a permanency goal of returning the Minors home within five months, allowing time for the parents to complete the recommended services. C.C. does not appeal from this order.

¶ 6     On January 31, 2025, J.A., Sr. filed motions to have the Minors returned home to him, alleging that he complied with reunification services, and requested custody of the Minors. On May 14, 2025, the court held an evidentiary hearing on J.A., Sr.'s motions and a permanency hearing. All parties were present and represented by counsel. At the outset of the hearing, the court admitted into evidence without objection a DCFS court report, a DCFS service plan from December 9, 2024, an April 30, 2025, neuropsychological evaluation for C.C., and a therapy report for C.C.

¶ 7     The first witness called at the hearing was DCFS case worker Christina Solis. The court initiated the questioning of Solis, and the court's questioning accounted for approximately half of Solis' testimony. In response to the court's questions, Solis first testified that C.C. had not attended a visit with the Minors since January 2025. Solis visited the home that J.A., Sr. shares with a

girlfriend and observed no concerns with either the home or the girlfriend. The Minors have had unsupervised overnight visits with J.A., Sr. every weekend since February. Solis provided updates on each of the Minors' medical issues and reported that she checked with the Minors' school and therapists and heard no concerns. She testified that, if the Minors were placed in his custody, J.A., Sr. would be open to making the Minors available for visits with their other siblings and would allow C.C. to see her children, unless it was determined to be unsafe. Solis testified that her recommendation was for the Minors to be returned to J.A., Sr. She did not recommend a return to C.C. because of C.C.'s lack of progress with services and visits. The Minors' foster parent also supported returning the Minors to J.A., Sr. Solis confirmed that J.A., Sr. completed all required services, and she did not believe that an additional service of family therapy was necessary.

¶ 8    The Public Guardian next questioned Solis, who added that the adult daughter of J.A., Sr.'s girlfriend also lives in their home, and her investigation of the daughter revealed no concerns. Solis spoke with the Minors' shared therapist, who agreed with returning the Minors to J.A., Sr., provided that the return occurs after the completion of the current school year. Solis visited with the Minors weekly, and during her last visit on April 25, 2025, she asked them individually about their wishes. Solis testified that E.C. did not want to return to J.A., Sr. because he has "too many rules," such as requiring her to make her bed and shower every day, and she "just doesn't like being there." According to Solis, E.C. has historically wavered with her wishes. Solis testified that, although he sometimes wavered like his sister, J.A., Jr. generally wished to return to his father. As with E.C., his only concern was his father having too many rules. A.A. reported to Solis that she wanted to return to J.A., Sr. Lastly, S.A. expressed to Solis that she did not want to return to her father, but that was the first time she said that. S.A. explained to Solis that there are too many rules

and that she did not want to hurt their foster parents' feelings by leaving. Solis testified that the Minors had never expressed they felt unsafe with their father. Solis confirmed that the Minors have significant educational needs, and she believed that J.A., Sr. would be able to address them.

¶ 9    When questioned by C.C.'s attorney, Solis testified that C.C. had received a traumatic brain injury in 2022, but that her nonverbal cognitive abilities were above average. C.C. was engaged in services, had completed parenting classes, was attending therapy, and was studying for her GED. Solis testified that C.C.'s therapist reported that C.C. felt overwhelmed and needed more support and resources. That feeling of being overwhelmed was the reason for C.C.'s limited visitation with the Minors.

¶ 10    In response to questions from J.A., Sr.'s attorney, Solis agreed that the father's visits had all been safe and appropriate. Solis believed that there was a strong bond between J.A., Sr. and the Minors, and she observed that the Minors were always happy to see their father. Solis testified that it was her and DCFS' opinion that it was in the Minors' best interests to be returned to J.A., Sr.'s custody.

¶ 11    C.C. testified that she was conflicted about J.A., Sr. getting custody of the Minors. She explained that she had been unsuccessfully trying to get him to see the Minors for years and did not like that he only became involved when this case began. On the other hand, C.C. wanted the Minors to have their father in their lives and she wanted him to commit to allowing her to visit the Minors.

¶ 12    At the conclusion of all of the testimony, but before the parties' attorneys presented their arguments, the court stated:

"I am prepared to send [J.A., Sr.'s] children home with him under an order of protection. However, [J.A., Sr.'s counsel], I had this issue come up earlier and there are always concerns about legalities and benefits. What I'd like to do is enter and continue your motion to June 3rd, after everybody tells me their position and we modify our October disposition for [J.A., Sr.] at that time, and then I find him fit, willing, and able to care for his four children. So I just want everyone to know what I'm thinking."

¶ 13    The court then heard arguments from the parties, during which the Public Guardian asked that the court order family therapy before returning the Minors to J.A., Sr. The State concurred that family therapy was "integral" to getting the Minors comfortable returning home. Following argument, the court agreed that the Minors and J.A., Sr. should engage in family therapy before the Minors return home. Accordingly, the court continued J.A., Sr.'s motion and ordered family therapy, with the court stating, "I want to be able to send the kids home before the next school year starts so everything's in place." Following the hearing, the court entered a permanency order again setting a permanency goal of return home within five months.

¶ 14    The parties reconvened on August 8, 2025, to continue the hearing on J.A., Sr.'s motion to return home. The court first called foster parent K.M. as a witness and asked her whether she needed anything for the Minors. K.M. responded that she did not. She also informed the court that she had not yet registered the Minors for school because she was waiting for the resolution of J.A., Sr.'s motion to return home.

¶ 15    Solis testified next, with the court leading the questioning. Solis provided updates on the same matters discussed at the previous hearing, with the only notable change being that the Minors and J.A., Sr. had been engaged in family therapy since the last hearing. On that issue, Solis testified

that the therapist informed her the therapy was "going well," with J.A., Sr. being "very empathetic," "listening," and "responding." J.A., Sr. was committed to continuing the Minor's visitation with their other siblings and with K.M. Solis continued to believe that it was in the Minors' best interests to be returned to J.A., Sr.

¶ 16    Following Solis' testimony, the Public Guardian asked that the court grant J.A., Sr.'s motion to return home as to A.A., but deny it as to the other children in accordance with each child's respective desire. The State asked that the motion be granted as to all of the Minors. The court granted J.A., Sr.'s motion as to all of the Minors and entered disposition orders finding J.A., Sr. fit, able, and willing to care for the Minors and ordering that the Minors be returned to J.A., Sr.'s care and custody under orders of protection. C.C. now appeals.

¶ 17    C.C. does not contest the merits of the court's decision to return the Minors to their father. Instead, she argues only that the court improperly deviated from a neutral role and demonstrated bias in favor of J.A., Sr., specifically citing the court's *sua sponte* questioning of Solis and K.M. and its statement at the conclusion of the first dispositional hearing on May 14, 2025, that it was inclined to rule in J.A., Sr.'s favor.

¶ 18    As an initial matter, we note that C.C. did not raise this issue in the trial court, and J.A., Sr. contends that C.C. has therefore forfeited the argument. While the failure to object and raise an issue in a post-trial motion generally forfeits an issue on appeal, "application of the forfeiture rule is less rigid where the basis of the objection is the circuit court's own conduct." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25 (citing *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000)). "Specifically, 'where the trial court departs from its role and becomes an advocate for the State's position, no objection by opposing counsel is necessary to preserve the issue for review.'" *Id.*

(quoting *Maher*, 314 Ill. App. 3d at 1097). Accordingly, despite her lack of objection, we find that C.C. has not forfeited her argument that the circuit court failed to act impartially. See *In re W.N.K.*, 2025 IL App (1st) 242008, ¶ 109 (finding that a respondent was not required to object to the circuit court's *sua sponte* questioning of witnesses to preserve an appellate argument that the court had improperly acted as an advocate for the opposing party). Because we will address this issue on its merits, we need not address C.C.'s alternative arguments that the court should review this issue for plain error or that her counsel provided ineffective assistance by failing to object.

¶ 19    Having found no forfeiture, we turn to the merits of C.C.'s argument. As a general matter, "[a] trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues." *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 (citing *Obernauf v. Haberstich*, 145 Ill. App. 3d 768, 771 (1986)). This is particularly true in cases under the Act, which provides that "[i]n all proceedings under this Act the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act." 705 ILCS 405/1-2(2) (West 2024). "Thus, under the [Act], 'unlike its customary role in civil or criminal proceedings, the court cannot sit passively and await the parties' presentation of evidence. Instead, the Act requires that it must act affirmatively, and perhaps at times aggressively, to ferret out information before it can decide that a child's interest is better served by removal from the family.'" *In re N.T.*, 2015 IL App (1st) 142391, ¶ 42 (quoting *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991)). We are also mindful that "[t]he trial judge is given wider latitude in examining witnesses in [a] bench trial, where the risk of prejudice is less and the court's inquiries are compatible with its role as

fact-finder." *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 (citing *Obernauf*, 145 Ill. App. 3d at 771).

¶ 20    However, the court must not depart from its role as a neutral magistrate and may not become an advocate for either party. *Id.* (citing *People v. Faria*, 402 Ill. App. 3d 475, 477 (2010)). When a court questions a witness, the propriety of that examination "must be determined by the circumstances of each case and rests within the discretion of the trial court." *N.T.*, 2015 IL App (1st) 142391, ¶ 43 (citing *Maher*, 314 Ill. App. 3d at 1097). A court abuses its discretion when it acts as an advocate for one of the parties and prejudices the opposing party. *W.N.K.*, 2025 IL App (1st) 242008, ¶ 114. To demonstrate prejudice from the court's questioning of a witness at a bench trial, "the aggrieved party must show 'the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence.'" *Zoey L.*, 2021 IL App (1st) 210063, ¶ 36 (quoting *People v. Smith*, 299 Ill. App. 3d 1056, 1063 (1998)).

¶ 21    C.C. argues that, by initiating the questioning of Solis and K.M. before the parties' attorneys and by conducting an extensive questioning of Solis, the court deviated from its role as a neutral arbiter and improperly assisted J.A., Sr. in proving his case. C.C. also contends that the court's bias is further demonstrated by its statement at the conclusion of the hearing on May 14, 2025, that it was inclined to rule in J.A., Sr.'s favor. After reviewing the entire record, we find no evidence of bias in the court's conduct and find that the court's questioning of two witnesses was not an abuse of discretion.

¶ 22    While the court did question Solis before the parties' attorneys and its questioning of Solis was lengthy, the court's questioning was entirely neutral and open-ended. Its questions elicited the truth and shed light on material issues regarding the Minors and concerned routine and customary

matters such as whether the Minors were current on their medical, dental, and vision check-ups, whether the Minors had any issues at school, what Solis had observed when visiting J.A., Sr.'s residence, and what Solis believed was in the Minors' best interest. The court asked questions about the Minors and "all of the documents" that the parties had admitted into evidence without objection, including the DCFS court report and service plan. The court asked questions about the Minors' foster homes, C.C.'s and J.A., Sr.'s visitation, whether J.A., Sr.'s home was safe, the Minors' medical needs and participation in therapy, and DCFS' recommendations for the Minors. The court, through its questioning, merely gathered information bearing upon the current condition and future welfare of the Minors, as allowed by section 405/1-2(2) of the Act. The court did not prevent any party from asking questions and allowed each attorney an opportunity to question Solis.

¶ 23    The court's questions were generally open-ended and designed to elicit further information essential to the resolution of the issues before the court and could have produced answers that favored either side. C.C. does not identify any particular questions as problematic or biased and we do not find any. When considering the circuit court's mandate of ensuring that the best interests of the children are prioritized, this type of neutral and open-ended questioning that could produce responses favoring either side is not improper. See *In re N.F.*, 2020 IL App (1st) 182427, ¶ 29 (holding that the court did not act as an advocate for the State by reopening the proofs when the court did not know what the additional evidence would show and the additional testimony "could have 'cut either way'"); *AL. P. v. Angel P.*, 2017 IL App (4th) 170435, ¶ 56 (holding that the court did not assume the role of an advocate by reopening the proofs and requesting additional evidence when the court did not know what the witness' testimony would reveal and "[t]he court's

motivation in reopening the proofs was not for a particular party to prevail but instead to determine what resolution was in the best interest of [the child at issue]"); *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 27 (holding that the court's questioning of the State's witnesses did not prejudice the mother when the court's questions were open-ended and "were designed to elicit further information that was essential to the adjudication of the issues before the court, and the questions could just as easily have elicited responses from the witnesses that were favorable to [the mother]").

¶ 24    Here, we cannot say, based on our examination of the record, that the circuit court's lines of questioning impermissibly assumed the role of an advocate for any party, showed any bias against C.C. or in favor of J.A., Sr., or was done in any way but a fair and impartial manner.

¶ 25    C.C. cites two cases in support of her argument, but they are readily distinguishable. First, *People v. Moriarity*, 33 Ill. 2d 606 (1966), concerned a criminal jury trial. There, our supreme court held that the circuit court had "abandoned its role as an impartial arbiter, and assumed the role of prosecutor and jury to an extreme degree" when, each time a witness identified the defendant, it took over questioning and made a point of emphasizing the identification; the court intervened and asked a pivotal question when the prosecutor faltered during direct examination of the complaining witness; the court "of its own volition supplied objections" to questions posed by defense counsel; the court rebuked defense counsel "in language from which the jury could not help but know that the court thought little of counsel and of the merits of the defense" when defense counsel "sought to object to the court's undue participation and to patently improper restrictions placed upon cross-examination;" and the court twice asked the defendant's wife in an accusatory manner whether she was aware of the penalties for lying while testifying. *Id.* at 613-14. The

supreme court concluded that these actions "severely and constantly prejudiced defendant in the eyes of the jury," necessitating a new trial. *Id.* at 614.

¶ 26    C.C.'s second case, *People v. Jackson*, 409 Ill. App. 3d 631 (2011), also involved a criminal trial in which this court held that the circuit court had "abandoned its role as a neutral and impartial arbiter of fact by adopting a prosecutorial role when questioning defendant's expert witness and by relying on matters based on prior private knowledge." Specifically, this court noted that the circuit court's questioning of the defendant's expert witness was "argumentative and showed a disregard and unfavorable bias" against the expert. *Id.* at 648. This court stated that "tone and manner" of the court's questioning was "more similar to a cross-examining prosecutor than an impartial jurist." *Id.* Further, the court on several occasions improperly relied on outside information and private knowledge to counter testimony of the defendant's expert. *Id.* at 649-50.

¶ 27    The circumstances here are wholly unlike those in *Moriarty* and *Jackson*. Aside from not involving a criminal trial, there is nothing in the transcripts of the dispositional hearings on J.A., Sr.'s motion to return home demonstrating that the circuit court had any bias against C.C. or in favor of J.A., Sr., and the court's questions were nothing like those of a biased party. Rather, the court properly asked routine, open-ended questions to Solis and acted within its broad power under the Act to affirmatively discover information that was relevant to its determination of what disposition would be in the Minors' best interests. See *N.T.*, 2015 IL App (1st) 142391, ¶ 42.

¶ 28    The same conclusion applies to the court's questioning of foster parent K.M., which consisted solely of two open-ended questions asking whether K.M. needed anything for the Minors and whether the Minors had been enrolled in school for the upcoming year. As with the court's questions to Solis, the court's questions to K.M. could have cut either way and were simply focused

on gathering relevant information about the Minors without any suggestion of bias. Further, although C.C. argues that the court did not invite any other party to question K.M., the record shows that no party asked to question K.M. and the court did not prevent any party from doing so. We find that the circuit court did not abuse its discretion in questioning either Solis or K.M.

¶ 29 Additionally, the court's statement at the end of the first hearing on May 14, 2025, that it was "prepared to send [J.A., Sr.'s] children home with him under an order of protection" likewise does not demonstrate bias against C.C. While a court should not prejudge the case before hearing all of the evidence (*Zoey L.*, 2021 IL App (1st) 210063, ¶ 36), the court's statement that it was inclined to rule in J.A., Sr.'s favor came *after* the court heard all of the evidence and testimony at the hearing. The court listened to the evidence first and then explained that, based on that evidence, it was prepared to rule in the father's favor, but wanted the Minors and their father to engage in family therapy before it entered a disposition order returning the Minors to him. Thus, C.C. has not met her burden to show that the court prejudged the outcome before hearing all of the evidence.

¶ 30 Accordingly, we reject C.C.'s argument that the circuit court acted impartially and affirm the court's orders placing the Minors in the custody of J.A., Sr.

¶ 31 Affirmed.