THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE REGA, Defendant-Appellant.

First District (1st Division)   No. 1—93—4238

Opinion filed February 14, 1995.

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michael Cho, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

When a judge undertakes the questioning of a defendant in a criminal trial before a jury, he must be aware of the line between legitimate truth-seeking and impermissible advocacy. In this armed robbery prosecution, the judge crossed the line by a wide margin. For that reason, we reverse the defendant's armed robbery conviction and remand for a new trial.

## THE EVIDENCE

On December 31, 1992, the defendant and Stewart Caldwell entered the Oasis liquor store. The cashier described how they entered the store together, walked up and down some aisles, then toward a cooler which was 10 to 15 feet from the counter. Caldwell pulled a gun from his jacket sleeve and demanded money from the cashier. He ordered her to "lay down." At first she refused, but after Caldwell threatened to kill her, she opened the register.

The defendant grabbed money from the opened cash register. Then he took cigarettes, candy, wine, gin, and juices, putting them in the paper bag where he had placed the money. They left the store.

Police officer Ronald Krupa saw the defendant and Caldwell run out of the liquor store. The defendant was carrying a bag under his arm. As the two reached the corner, Krupa heard a police dispatch describing the liquor store robbers. Krupa pursued.

The officer ran to an alley, where he saw the defendant and Caldwell looking inside a bag. The defendant held the bag. When the defendant noticed Krupa, he said "Aw, f- - -, the police." When Krupa ordered them to "freeze," they ran into the rear of a nearby building.

Later, police entered an apartment in that building. The defendant and Caldwell were in the apartment. After a time, the defendant showed Krupa where the gun was and Krupa retrieved it, an unloaded sawed-off shotgun. The police found and opened the bag the defendant had been carrying. They found the stolen property and coins, but not the currency. The currency was not recovered.

Later that day, the defendant gave a statement to Assistant State's Attorney Anita Alvarez. In summary, the defendant said he and Caldwell "planned to rob a liquor store at 2434 West 47th Street." When they entered the store, Caldwell pulled out the

shotgun. The defendant went to the cash register and removed the money. He placed the money in a paper bag with other stolen items. They then ran to the apartment building where Caldwell hid the gun before it was tossed out the back porch window.

The defendant took the stand. He said he had known Caldwell for several years and they were friends. On December 31, 1992, they talked about "going to steal some liquor from the liquor store." Caldwell was wearing blue sweat pants and a big, blue jacket. The plan was that the defendant would grab a bottle of wine and set it on the counter to distract the cashier. Then Caldwell would take bottles of wine and put them in his big jacket.

The defendant denied ever seeing the shotgun or knowing Caldwell had it. He said the first time he saw it was when Caldwell pulled it out of his jacket at the liquor store, after the bottle of wine was placed on the counter. The defendant denied ever touching the gun or threatening the cashier. He denied seeing anyone give the gun to Caldwell. It was never his intention, he said, "to rob" the store.

Why did he take the money and property after Caldwell pulled out the shotgun? "Because I didn't want to refuse, because I didn't want anybody to get hurt in the liquor store."

The assistant State's Attorney then cross-examined. Her questions and the defendant's answers covered 35 pages of transcript. It was a thorough and vigorous cross-examination, covering in detail the plan, his use of the words "to rob the store," the taking of money and property, his knowledge of the shotgun, throwing the money away, and his relationship with Caldwell.

The defendant's knowledge and intent were explored at length. He was questioned in detail about variances between his trial testimony and his prior statements to a police officer and to a child welfare specialist named Regina St. John. (Later, in rebuttal, the officer and St. John testified to defendant's damaging statements about his knowledge and intent.) He denied telling the police officer he planned a "stickup." What did he mean when he used the word "rob?" He meant "steal."

The prosecutor questioned the defendant concerning the first time he told anyone he was surprised when Caldwell pulled out the shotgun at the liquor store:

"A. It was about a month ago.
***
Q. Okay. And at that time you were preparing with your attorney for trial, right?
A. Right."

During the cross-examination, at sidebar, the judge made clear his lack of enthusiasm for the defense. He questioned the defendant's

credibility. He said the story was "not logical" and that defendant "couldn't possibly not know" that Caldwell had a gun hidden up his sleeve. The jury did not hear the judge's comments, but the prosecutor did. She again questioned the defendant about his statements to the police and his role in creating the plan.

After redirect examination and more cross-examination by the prosecutor, the judge took over. His cross-examination of the defendant covers $7^1/_2$ transcript pages. We set it out in its entirety:

"Q. You are saying you and Stewart planned to steal liquor from the liquor store?

A. Right.

Q. And that's all you planned to do?

A. Right.

Q. There is no conversation by you with this other gentleman about the gun?

A. No.

Q. You were in the store the day before, so you knew where the liquor was, right?

A. Right.

Q. When April, and that's Ace's girl friend, and that's your cousin?

A. That's right.

Q. Were you in the store the day before?

A. Right.

Q. You saw her pay the cashier?

A. Yes.

Q. And you were present when that happened?

A. Yes.

Q. So you saw the cash drawer open?

A. Yes.

Q. Okay. Okay. You left. And the next morning you are saying it's your friend, Stewart, that came up with the idea and planned to steal from the liquor store?

A. Right.

Q. And he had this big coat on?

A. Yes.

Q. And he's only five-seven?

A. He's real fat though.

Q. Real fat. And he had something under his coat? You never asked him what was under his coat?

A. I didn't see anything under his coat.

Q. You didn't see anything? You didn't see specifically that shotgun that is on the table?

A. No.

Q. Okay. Okay. So you go to him and you plan to commit a crime, correct?

A. Right.

Q. And you go to the store with the thought in mind that you are going to steal?

You never thought that you would have to shove or force or threaten anyone with force?

A. No.

Q. Or the threat of force?

A. No.

Q. Your idea was to deceive and steal by the cashier not seeing because you were going to distract her?

A. That's right.

Q. So your intent was never to have her know that you were going to commit a crime in the store?

A. That's correct.

Q. And that's what you intended, and that's what your intention was when you made this agreement with this other boy?

A. Right.

Q. Okay. Okay. And when you got to the store, correct?

A. Yes.

Q. And at some time as you are placing the bottle of Wild Irish Rose on the counter, your friend and your accomplice and the person that you planned to steal with changed the plans?

A. Yeah.

Q. And now you are saying you see for the first time that sawed-off shotgun?

A. Not right now. I seen it when he pulled it out in the store.

Q. In the store is the first time you saw it?

A. Right.

Q. And you are saying that the only reason you didn't withdraw from this crime is that you wanted to protect the people in the store?

A. Right.

Q. Okay. Okay. So then when he said get the money to you, you got the money?

A. Right.

Q. Which you also took some other—but you also took some other things?

A. Right.

Q. And you also planned on keeping those things once this started and once you knew he was armed?

A. Right.

Q. Okay. Okay. It was never your intent to give the money back

or not to take part or not profit from this crime that was going on?

A. No.

Q. Okay. Okay. But while you were in the store, you didn't say to your friend, 'Let's not do this. I'm not involved in an armed robbery.' You never said that because you were fearful for the safety of the occupants?

A. That's right.

Q. Okay. So now you leave the store with the bag, the shotgun and your friend?

A. Right.

Q. Okay. The occupants are saved, is that correct?

A. That's correct.

Q. Did you say to your friend then, how could you do that? Let's give the money back. I didn't want to commit such a horrendous crime.

A. I didn't say anything to him, no, sir.

Q. You were still participating in what you did, and you were going to profit from what happened?

A. Right.

Q. Okay. Now, you are in the alley, and I would think that you are excited, your heart is pumping, your adrenalin is flowing. You are pretty excited at this time.

A. Yes, sir.

Q. Okay. Were you screaming at him, 'How could he do that? How could you bring this shotgun with you when we only planned to shoplift?'

A. I didn't say anything to him because when we—

Q. You were no longer afraid for the safety of the people in the store. There must be some other reason that you didn't say anything to him when you were outside the store. What is that?

A. Why I didn't say anything to him?

Q. Well, you know, I'm not saying why. I'm saying did you.

A. I didn't say anything to him.

Q. Now, the police come. The police officer is there?

A. Yes.

Q. He said, 'Halt.' Did you say, 'I didn't know he had a gun?'

A. No.

Q. You ran?

A. Yes.

Q. You ran to a house, and you were arrested?

A. Yes.

Q. Okay. First off—The first officer on the scene, you didn't tell him that, 'I didn't know he had a gun?'

A. No.

Q. And I was trying to protect the people?
A. No.
Q. And you were also saying no one asked you that question?
A. No one asked me that question.
Q. Did you ever get an opportunity to talk to your mom and dad?
A. No.
Q. Not from the time you were arrested until you talked to your lawyer, you never had an opportunity to talk to mom and dad?
A. I don't—I talked to my mother one time for about three minutes on the phone and told her I was at the audie home.
Q. You didn't tell her that you weren't involved in an armed robbery, that they have the evidence wrong, that you didn't mean to commit this crime? You didn't say that you didn't know to her about not having this shotgun?
A. I didn't say anything to my mother about that.
Q. Okay. So the first time is some six months after this you talked to your lawyer?
A. Yes."

When the judge completed his examination, the defense moved for a mistrial. The motion was denied.

The jury found the defendant guilty of armed robbery and two counts of unlawful use of weapon. He was sentenced to 10 years in prison.

OPINION

The principle of law that guides us is well known:

"It is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice, but in so doing he must not forget the function of the judge and assume that of the advocate." *People v. Lurie* (1917), 276 Ill. 630, 641, 115 N.E. 130.

Also see *People v. Franceschini* (1960), 20 Ill. 2d 126, 132, 169 N.E.2d 244.

When the judge asks questions in a jury trial, he must be especially sensitive. He must question in a "fair and impartial manner, without showing prejudice or bias against either party." (*People v. Gilbert* (1957), 12 Ill. 2d 410, 415, 147 N.E.2d 44, 47.) Jurors watch for the attitude of the trial judge. "In a criminal trial, a hostile attitude toward an accused, or his witnesses, is very apt to influence the jury in arriving at its verdict." *People v. Marino* (1953), 414 Ill. 445, 451, 111 N.E.2d 534.

There is a line of judicial propriety. It "is clearly crossed when the judge departs from his function as a judge and assumes the role of prosecutor." (*People v. McGrath* (1967), 80 Ill. App. 2d 229, 236, 224 N.E.2d 660. Also see *People v. Cofield* (1973), 9 Ill. App. 3d 1048, 1051, 293 N.E.2d 692.) When that happens, defense objection or not, judicial influence fatally infects the trial. *People v. Santucci* (1962), 24 Ill. 2d 93, 99, 180 N.E.2d 491.

The evidence in this case could easily persuade the jury that the defendant used the necessary force or threat of force that comprises the offense of armed robbery. (See *People v. Lewis* (1995), 165 Ill. 2d 305.) His contention was that he was guilty only of theft. The trial judge agreed to instruct the jury on the lesser-included charge of theft. The judge allowed defendant's lawyer to argue the theft-only theory to the jury. It was the jury's responsibility to accept or reject the defense.

The fact that the evidence against the defendant was strong does not diminish his right to a fair trial. That is, "However strong the evidence against an accused may be, *** a fair trial, in all its stages, is a fundamental requirement in a criminal prosecution and when such requirement is not met, it amounts to a denial of due process of law." *People v. Sprinkle* (1963), 27 Ill. 2d 398, 400, 189 N.E.2d 295 (extensive questioning and comments by trial judge violated defendant's right to a fair trial).

In *People v. Finn* (1959), 17 Ill. 2d 614, 617, 162 N.E.2d 354, a burglary case, the defendant was caught in the house he was burglarizing, with some of the stolen property in his pockets. Questions and comments by the judge, evincing disbelief in the defendant's insanity defense, deprived defendant of a fair trial.

The trial judge in this case did not believe the defense. At one point, out of the jury's presence, he referred to the defense as "poppycock." Part of his hostility was directed at the defense lawyers. On at least two occasions, again out of the jury's presence, he noted that the "shoplifting" defense did not arise until the defendant talked to his court-appointed lawyers. The judge was entitled to his private opinion, but he shared it with the jury when he asked the defendant:

"Q. Not from the time you were arrested until you talked to your lawyer, you never had an opportunity to talk to mom and dad?

A. I don't—I talked to my mother one time for about three minutes on the phone and told her I was at the audie home.

Q. You didn't tell her that you weren't involved in an armed robbery, that they have the evidence wrong, that you didn't mean to commit this crime? You didn't say that you didn't know to her about not having this shotgun?

A. I didn't say anything to my mother about that.

Q. Okay. So the first time is some six months after this you talked to your lawyer?

A. Yes."

Later, the trial judge defended his questioning. He said it was "solely for the purpose of defining the issues to instruct the jury on. I do not think it was in any way, shape or form in the nature of a cross-examination."

The judge was being modest. It was a textbook cross-examination: terse, probing, telling, using touches of sarcasm, impeaching by omission on material facts. It was everything a cross-examination should be—for prosecutors, not judges.

It also was unnecessary. The prosecutor's extensive cross-examination had covered every point explored by the judge. Whatever the trial judge's purpose, his cross-examination deprived the defendant of his right to subject the prosecution's case to "meaningful adversarial testing." (*People v. Hattery* (1985), 109 Ill. 2d 449, 464, 488 N.E.2d 513.) With that cross-examination, any hope the defendant might have had to persuade the jury went out the window. The adversary system broke down.

## CONCLUSION

We reverse the defendant's convictions and remand the cause for a new trial.

Reversed and remanded.

BUCKLEY and BRADEN, JJ., concur.