2023 IL App (4th) 220384

NO. 4-22-0384

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| ANDREW HOLLAND, | ) | No. 20CF2041. |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice DeArmond and Judge Turner concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a bench trial, the trial court found defendant, Andrew Holland, guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2018)) and sentenced him to 10 years in prison. He appeals, arguing the court (1) departed from its function and "crossed the line into advocacy" by questioning three of the four witnesses who testified at his trial and (2) improperly relied on evidence outside the record at his sentencing. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In October 2020, defendant was indicted on one count of criminal sexual assault (*id.*). The charge was based on allegations that defendant committed an act of sexual penetration with the victim, A.M.G., while knowing A.M.G. "was unable to understand the nature of the act or was unable to give knowing consent." During pretrial proceedings, defendant waived his right

to a jury trial and elected to proceed in the matter *pro se.* In August 2021, his bench trial was conducted.

¶ 4        At trial, the State presented testimony from three witnesses—A.M.G., Mia Guerrero, and defendant's daughter, Emily Chambers. Its evidence showed that the three witnesses spent the evening of May 29, 2020, into the early morning of May 30, 2020, together. At some point in the evening, the witnesses, along with two other individuals, visited defendant's studio apartment in Rockford, Illinois. A.M.G testified that after an hour or two at the apartment, defendant drove everyone to a liquor store to "get drinks." The group then returned to defendant's apartment, where they watched a movie and drank alcohol. A.M.G. stated that while at the apartment, she drank Mike's Hard Lemonade.

¶ 5        According to A.M.G., Chambers eventually decided that she wanted to visit a friend in Belvidere, Illinois. Defendant then drove the group to Belvidere, where they visited the home of an individual named Ariana. A.M.G. testified that the group continued to drink on the trip, and she recalled that by the time they visited Ariana's house, she had consumed a full can of Mike's Hard Lemonade and "a little bit of a Four Loko."

¶ 6        Ultimately, the group, along with Ariana, decided to return to defendant's apartment. A.M.G. recalled "getting sick" on the trip and stated she "threw up" in a field near Ariana's house. She did not have any memory of the ride back to defendant's apartment and stated the next thing she remembered was "being placed on the bed." A.M.G. then remembered "waking up for a second" and seeing defendant "grabbing onto [her] ankles and his penis *** going in and out of [her] vagina." She asserted she "blacked out again" and woke up on "the couch bed" in defendant's apartment the next morning. A.M.G. denied that she wanted to have sex with defendant or that she gave him permission to have sex with her.

¶ 7          The record reflects Guerrero and Chambers provided substantially similar testimony to that provided by A.M.G. Guerrero testified that before May 29, 2020, she had never met defendant. On that date, the group was both "drinking" and "smoking" at defendant's apartment. She recalled that the group left the apartment once to go to Belvidere to pick up Chambers's friend, Ariana. During the trip, both Chambers and defendant drove. When they arrived at Ariana's house, A.M.G. vomited multiple times and Guerrero observed "foam *** coming out of the side of [A.M.G.'s] mouth." When the group arrived back at defendant's apartment, A.M.G. was unconscious and defendant carried her "upstairs," where A.M.G. "laid down on the bed." Guerrero testified everyone remained in the apartment "until the early morning." At that point, everyone left the apartment except for A.M.G. and defendant. Guerrero stated that when she left to go home, A.M.G. "was still unconscious."

¶ 8          On cross-examination, defendant elicited testimony from Guerrero that she spent time with defendant and Chambers on another occasion when defendant took them swimming. However, she denied that she spent "the whole month" at defendant's residence and asserted that she thought the swimming trip took place after the incident involving A.M.G.

¶ 9          Following defendant's cross-examination, the trial court posed several additional questions to Guerrero regarding whether Chambers drove separately to Belvidere, whether everyone that was at defendant's apartment went to Belvidere, and how defendant was acting toward A.M.G. during the course of the evening. In response to the court's questions, Guerrero clarified that Chambers rode in the same vehicle as everyone else on the trip to Belvidere. She stated that defendant drove, but Chambers "switched" places with him "when [defendant] was drinking." Guerrero also testified that everyone who was at defendant's apartment went on the trip. Further, she described defendant as acting "flirty" with A.M.G. by complimenting her and

appearing like he wanted to "be around her."

¶ 10 On further cross-examination by defendant, Guerrero indicated defendant acted flirtatiously with A.M.G. both at his apartment and while driving. She denied observing A.M.G. take a blue Ecstasy pill during the evening, stated she did not remember what defendant was drinking, and asserted that defendant was also smoking "weed." Additionally, Guerrero testified that she remembered going to the lake with defendant and Chambers but, again, she denied that she spent "a whole month at [his] house."

¶ 11 After defendant's questioning, the trial court asked Guerrero if she had ever spent "a month with [defendant] somewhere." She denied having done so. The court also asked Guerrero to explain "the thing about the lake." Guerrero responded that she went with defendant and Chambers to Lake Geneva in Wisconsin, but she asserted the trip was not a month long and she was not at defendant's apartment. In response to questions from the court regarding how long the trip to the lake was and when it occurred, Guerrero testified the trip was only for the day and that it occurred in "June or May." In response to further questions from both defendant and the State, Guerrero testified she never spent the night at defendant's apartment.

¶ 12 Chambers testified that at the end of May 2020, she had been staying with defendant at his apartment. She recalled "hanging out" at the apartment with A.M.G., Guerrero, and two other individuals on the night in question. At some point, defendant drove the group to a gas station to buy alcohol, after which they returned to the apartment and "were drinking and stuff." Chambers testified that both A.M.G. and defendant were drinking. Later in the evening, defendant drove the group to Belvidere to pick up Chambers's friend, Ariana. Chambers testified people were drinking during the drive, including A.M.G. On the way back to defendant's apartment, A.M.G. vomited, and Chambers observed something that "looked like foam." When the group arrived at the

apartment, A.M.G. was "out of it" and unable to walk on her own. Defendant and an individual named Victor helped A.M.G. into the apartment and defendant "laid her on the futon." Chambers testified that both defendant and A.M.G were sleeping, so everyone else left the apartment. They tried to wake A.M.G. before they left, but she did not wake up. A month or two later, Chambers learned that A.M.G. was "saying [defendant] had raped her" and she questioned defendant about it. According to Chambers, defendant initially stated "he didn't *** do anything with her." He then stated that A.M.G. told him she was 18 and that " 'she wanted to.' "

¶ 13    On cross-examination by defendant, Chambers reiterated that defendant drove the group to Belvidere. She also recalled a time when Guerrero spent the week with them "at [defendant's] house." Further, Chambers recalled that, on the evening in question, defendant asked A.M.G. how old she was and A.M.G. responded that she was 18. She also stated that A.M.G. and defendant were touching one another and that A.M.G. stated it was her birthday and "she wanted to party."

¶ 14    Following defendant's cross-examination, the trial court questioned Chambers regarding Guerrero's previous visits to defendant's residence; the interactions between defendant and A.M.G. on May 29 and 30, 2020; A.M.G.'s drinking; how A.M.G. appeared after she had been drinking; where A.M.G. and defendant were located when Chambers left the apartment; and who drove the group to Belvidere. In response, Chambers testified that the week Guerrero spent with her and defendant at defendant's apartment occurred after the incident involving A.M.G. Additionally, she stated that on the night in question, A.M.G. acted flirtatiously toward defendant. She noted A.M.G. wanted to sit up front with defendant while he was driving and that defendant and A.M.G. were whispering in each other's ears. Chambers recalled seeing A.M.G. "rest her arm on" defendant but denied seeing "them kiss or doing anything more than [being] flirty."

¶ 15      Chambers further testified that A.M.G. and Guerrero had been drinking before Chambers met up with them. She estimated that at the apartment, A.M.G. had three Mike's Hard Lemonades. After A.M.G. drank at the apartment, she was "knocked out" and "looked really tired." Chambers described A.M.G. as being "in and out of it." When Chambers left the apartment, A.M.G. was on a futon and defendant was "on the bed." Finally, Chambers stated that defendant drove the group to Belvidere, but she drove on the way back because defendant "was a little too drunk to drive."

¶ 16      Following Chambers's testimony, the State rested, and defendant testified on his own behalf. Defendant maintained that A.M.G. visited his apartment on May 29, 2020, and "popped a blue [Ecstasy] pill" but was not drinking. He asserted he did not smell alcohol on A.M.G.'s breath and denied that she was ever unconscious or that she had to be carried into his apartment. According to defendant, he asked A.M.G. to have sex with him and she told him "yes" and stated she was 18 years old. The next morning, A.M.G. asked defendant to take her home because she had to be at work. Defendant dropped A.M.G. off at her house and asked her if everything was okay. According to defendant, A.M.G. responded that "everything was fine."

¶ 17      Defendant also testified that he did not recall going to a liquor store to buy alcohol for the group or driving anyone to Belvidere. He maintained he gave his daughter the keys to his van and "she had the van that whole day and that night."

¶ 18      On cross-examination, defendant reiterated that A.M.G. was never unconscious. He stated he did not go to Belvidere, never drove the individuals at his apartment anywhere that night, and did not help carry A.M.G. and put her in bed. He asserted that around 10 or 10:30 p.m., while everyone else went to Belvidere, he and A.M.G. stayed at his apartment and talked about having sex. Defendant agreed that he and A.M.G. had sex. He testified that A.M.G. was awake during sex

and not intoxicated. Defendant maintained that A.M.G. was not drinking alcohol but stated she did vomit in his bathroom after she "popped the pill." He asserted that everyone was present at his apartment when A.M.G. vomited.

¶ 19 Upon inquiry by the trial court, defendant additionally testified he was 53 years old. He recalled that Chambers and her friends arrived at his apartment around 9 p.m., and he agreed that those present at the apartment with him included Chambers, Guerrero, A.M.G., an individual named Victor, and an unnamed white male. Defendant testified they all came to his apartment at the same time and that he had been home alone prior to their arrival. When asked by the court what everyone did when they first arrived, defendant stated that A.M.G. kept asking Chambers to "get her a pill." He asserted A.M.G. stayed with him at his apartment while everyone else left. After 10 to 15 minutes, Chambers returned and gave A.M.G. a blue pill. Defendant stated A.M.G. took the pill and vomited in his bathroom approximately 20 minutes later.

¶ 20 After everyone returned to the apartment, Chambers drank, while everybody else was "smoking weed." While at defendant's apartment, A.M.G. neither smoked nor drank. After 10 minutes, everyone except A.M.G. left again. Defendant testified that both Chambers and Guerrero asked A.M.G. if she was leaving and she told them "no." He stated that A.M.G.'s visit to his apartment was the first time he had met her. When the group left his apartment, Chambers stated they were "going back Belvidere" to her mother's house. After leaving, they did not return for the remainder of the night. Defendant testified that he knew an individual named Ariana but denied that she ever came to his apartment.

¶ 21 Defendant further testified that Chambers and the others went to Belvidere twice, once "to go get a pill" and a second time to spend the rest of the night there. He stated that Chambers went to Belvidere to get the pill because she knew "a female out there that sells that

stuff." Defendant maintained that when he and A.M.G. were alone in the apartment the first time, they were "hugging and touching" or "rubbing each other." When they were alone the second time, defendant and A.M.G. had sex in his bed. Afterwards, A.M.G. "walked herself to the futon." Defendant asserted everyone but A.M.G. left his residence for the night at around 11:30 p.m. or midnight. He denied having anything to drink on the night in question.

¶ 22      Following the trial court's inquiries, the State asserted it had no further questions. Defendant also maintained he had no further evidence and rested his case. As indicated, the court found defendant guilty of the charged offense. In setting forth its decision, the court determined the testimony of the State's witnesses was largely consistent and credible. It also found A.M.G.'s demeanor when testifying "seemed appropriate for having been—allegedly being the victim of a sexual assault." The court stated A.M.G.'s testimony "was credible concerning having been sexually assaulted."

¶ 23      Following trial, the trial court reappointed counsel for defendant. In November 2021, defendant's counsel filed an amended motion for a new trial on defendant's behalf, which the court denied in December 2021. In February 2022, defendant also filed a motion in arrest of judgment, asserting his indictment failed to inform him of the charge against him with sufficient specificity. In March 2022, the court denied that motion and conducted defendant's sentencing hearing.

¶ 24      Defendant's presentence investigation report (PSI) showed he had a lengthy criminal history. Prior to 2017, all of defendant's convictions were from Maryland. They included felony convictions for second degree rape in 1992 and theft in 1998. They also included misdemeanor convictions for battery in 1992, violating a protection order in 1997, "poss[essing] paraphernalia" in 1997, possession of marijuana in 2004, nonsupport of a minor child in 2007,

assault in 2009, trespass in 2011, and "poss[essing] paraphernalia" in 2014. In Illinois, defendant had misdemeanor convictions for contributing to the delinquency of a minor and battery in 2019. Defendant also had several traffic-related violations. The PSI showed defendant was sentenced to probation in connection with his second degree rape conviction. In 2000, he was found to have violated his probation for that offense, resulting in the following disposition: "10 years Division of Corrections reimposed with credit time served, balance of 10 years suspended, sentenced to additional 30 days in CCDC, probation terminated unsatisfactorily."

¶ 25        According to the PSI, defendant stated he was raised in Maryland and had close relationships with his family members. He reported being a high school graduate and having worked various jobs since about the age of 22. Prior to his arrest, defendant worked two jobs and resided with his girlfriend. The PSI also showed that defendant had eight children with six different women, and he owed approximately $30,000 in unpaid child support to two of them. He also reported that he had been diagnosed with schizophrenia in the 1980s and was taking medication for his mental health while in jail. Defendant denied having any substance abuse issues.

¶ 26        Finally, the PSI noted that defendant "displayed criminal thinking" by "not holding himself accountable for his behaviors that got him into trouble with the law when he discussed some of his past arrests." Despite his criminal record, defendant maintained he " 'really [didn't] get into trouble with the law,' " and he described his more recent criminal convictions as being unfair.

¶ 27        At the sentencing hearing, the trial court also considered A.M.G.'s victim impact statement, in which she asserted that her life had been "forever changed" by defendant's actions. She stated that because of the incident at issue, she was fearful of men, suffered from post-traumatic stress disorder, and experienced "night terrors and horrible nightmares."

¶ 28    The State presented no additional evidence and recommended that the trial court sentence defendant to 10 years in prison. It asserted that aggravating factors in the case included that defendant's conduct caused or threatened serious harm to A.M.G., specifically emotional and mental anguish; defendant had a history of prior criminal activity, in particular prior convictions for a sex offense and assault; and there was a need for deterrence. Defendant's counsel asked the court to impose only a four-year prison sentence. Counsel argued that a factor in mitigation included that defendant's conduct neither caused nor threatened serious physical harm to another. Counsel also asked the court to consider that it had been "a long time since [defendant] had a more serious criminal history," he tried to turn his life around and improve himself, and he provided support to his daughter and his girlfriend.

¶ 29    The trial court sentenced defendant to 10 years in prison. It found defendant's prior criminal history was an aggravating factor, noting it dated back several years and included prior felony convictions for "second degree rape" and theft. Regarding defendant's prior rape conviction, the court stated as follows:

   "But the fact that he has a prior rape conviction, it still surprises me that this [PSI] doesn't say anything about it other than the fact of it. It doesn't talk about the facts of it, his response to it, his thoughts about it, doesn't have anything. And that seems like the most important one that probation would have looked into.

   I will state for the record, I looked up on the [i]nternet what rape in the second degree is and it reads exactly the same as criminal sexual assault here in Illinois. I mean, possibly some variations, but, I mean, the potential, it's just—it doesn't involve the use of a weapon, it can be without someone giving knowing consent, exactly what is alleged here. But appears to be basically the same thing."

The court concluded that all of the aggravating factors suggested by the State were appropriate in defendant's case. Specifically, it found that A.M.G. had clearly suffered psychological harm and that "the prior rape offense [was] a big factor in" determining the appropriate sentence.

¶ 30　　　　Shortly following his sentencing, defendant filed a motion to reconsider his sentence; however, the written motion does not appear in the appellate record. In May 2022, the trial court conducted a hearing on the motion. Defendant's counsel argued that defendant's 10-year sentence was "excessive in light of his history and more recent character." Counsel noted defendant had no felony convictions since the 1990s and asserted such circumstances showed "a change in [defendant's] attitude towards the law." She also argued that the court's consideration of defendant's rape conviction was "improper." Counsel noted that, according to the PSI, defendant received probation for that offense and a suspended sentence. Based on that information, counsel reasoned that the offense was "clearly something different and treated differently from" the underlying offense. Counsel further argued that the court gave too much weight to aggravating factors and, again, argued "there was no serious physical harm" at issue in the case.

¶ 31　　　　The trial court denied the motion to reconsider. In setting forth its decision, the court acknowledged that the rape conviction "was a matter of significance to [it] considering the nature of the [underlying] charge." It stated that although that conviction "was approximately 30 years ago," it was appropriate for the court's consideration. The court further stated as follows:

> "But I don't believe that it was inappropriate in the way that I considered it here. It is relevant, the fact that it is another sex offense and is—I'm sentencing him on a sex offense here. It was a—this offense is a nonprobationable 4 to 15 years range. He was convicted following trial, and I believe that the—considering all the factors in aggravation and mitigation that the sentence I fashioned was appropriate in light

- 11 -

of all the circumstances ***."

¶ 32    This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34              A. Trial Court's Questioning of Witnesses

¶ 35    On appeal, defendant first argues the trial court erred by questioning three of the four witnesses who testified at his bench trial. He contends that, in doing so, the court failed to act impartially and, instead, functioned as an advocate for the State. Defendant maintains the court's actions deprived him of his right to a fair trial. He seeks reversal of his conviction and a new trial.

¶ 36    Initially, defendant acknowledges that he forfeited this issue by failing to object to the trial court's questioning at trial or raise the issue in a posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). However, he contends his forfeiture should be overlooked because (1) the forfeiture rule is applied less rigidly when "the basis for the objection is the judge's conduct" or (2) plain error occurred.

¶ 37    In *People v. Sprinkle*, 27 Ill. 2d 398, 401, 189 N.E.2d 295, 297 (1963), the supreme court "first recognized that judicial misconduct could provide a basis for relaxing the forfeiture rule." *People v. McLaurin*, 235 Ill. 2d 478, 485, 922 N.E.2d 344, 349 (2009). "[U]under the *Sprinkle* doctrine, the forfeiture rule may be relaxed when a trial judge oversteps his or her authority in the presence of the jury or when counsel has been effectively prevented from objecting because it would have fallen on deaf ears." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 612, 939 N.E.2d 403, 412 (2010). "The failure to preserve an error will be excused under the *Sprinkle* doctrine only in extraordinary circumstances *** such as when a

judge makes inappropriate remarks to a jury or relies on social commentary instead of evidence in imposing a *** sentence." *Id.*

¶ 38    Here, defendant's case did not involve a jury, and nothing in the record supports a finding of extraordinary circumstances. Although defendant contends it is "abundantly clear from the record that any objection would have been futile," his assertion is conclusory, and he cites nothing in the record that would support a finding that any objection to the court's questioning of witnesses would necessarily "have fallen on deaf ears." Accordingly, relaxation of the forfeiture rule is not warranted under the facts presented.

¶ 39    As stated, defendant also argues his forfeiture should be excused based on the occurrence of plain error. "The [plain error] doctrine serves as a narrow and limited exception to the general rule of procedural default." *People v. Jackson*, 2020 IL 124112, ¶ 81, 162 N.E.3d 223.

> "A reviewing court will consider unpreserved error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

"The initial step under either prong of the plain-error doctrine is to determine whether the claim presented on review actually amounts to a 'clear or obvious error' at all." *People v. Harvey*, 2018 IL 122325, ¶ 15, 115 N.E.3d 172. In this instance, we find no clear or obvious error occurred.

¶ 40    "It is well established that a trial judge has the right to question witnesses in order to elicit the truth or to clarify issues which seem obscure." *People v. Williams*, 173 Ill. 2d 48, 79, 670 N.E.2d 638, 653 (1996); *People v. Liberman*, 228 Ill. App. 3d 639, 649, 592 N.E.2d 575, 582

(1992) ("A trial judge may question a witness to clarify or fill certain gaps in a witness' testimony."). "The trial judge's examination must be conducted in a fair and impartial manner, without indicating bias or prejudice against either party." *Williams*, 173 Ill. 2d at 79. "It is improper *** for the judge to assume the role of an advocate [citations] or to suggest through comments or questions an opinion regarding the facts of the case or the credibility of witnesses [citation]." *People v. Falaster*, 173 Ill. 2d 220, 231-32, 670 N.E.2d 624, 630 (1996). "Whether the trial judge's questioning is proper depends on the circumstances of each case and rests largely within the discretion of the trial court." *Williams*, 173 Ill. 2d at 79.

¶ 41        Additionally, "[w]here *** a defendant is being tried without a jury, the danger of prejudice stemming from a judge's questioning of a witness is decreased sharply." *People v. Smith*, 299 Ill. App. 3d 1056, 1063, 702 N.E.2d 218, 222 (1998). "In a nonjury trial, prejudice is shown when the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence." *Id.*

¶ 42        Both parties suggest the appropriate standard of review in this case is the *de novo* standard. They rely on the First District's decision in *People v. Stevens*, 338 Ill. App. 3d 806, 790 N.E.2d 52 (2003), for the proposition that such a standard applies when determining whether a trial judge "overstepped the boundaries of judicial propriety in questioning a witness." However, the issue presented in *Stevens* concerned the trial court's conduct during defense counsel's closing argument. *Id.* at 809. That case did not involve the trial judge's questioning of witnesses at the defendant's trial, which, as set forth above, is a matter within the court's discretion. *Williams*, 173 Ill. 2d at 79.

¶ 43        In *People v. Romero*, 2018 IL App (1st) 143132, ¶¶ 88-94, 105 N.E.3d 1048, the First District addressed the same issue presented by this case and applied an abuse-of-discretion

standard. Significantly, like in this case, the defendant in *Romero* cited *Stevens* for the proposition that a *de novo* standard of review applied "in determining whether 'a judge overstepped the boundaries of judicial propriety in questioning a witness.' " *Id.* ¶ 88 n.3 (citing *Stevens*, 338 Ill. App. 3d at 810). The *Romero* court rejected that argument, finding the defendant's assertion represented "an inaccurate representation of the analysis in *Stevens*," and stating as follows:

"*Stevens* did not even consider the issue of a trial judge's questioning of a witness. Rather, in that case, the trial judge repeatedly interrupted defense counsel during closing argument, imposed a time limit on defense counsel's closing argument, and remarked, before defense counsel completed closing argument, that ' "I'm as clear as can be and convinced as can be that the State has proven [that defendant committed the offense.]" ' [Citation.] On review, this court determined *de novo* review was appropriate where the trial court essentially deprived defendant of his sixth amendment right to the assistance of counsel. [Citation.] Thus, the situation here bears little similarity to *Stevens*, and we find *de novo* review is not appropriate on this issue." *Id.*

¶ 44 Here, we also reject the parties' contention that, based on *Stevens*, a *de novo* standard of review should apply to this case. Instead, we consider whether the trial judge abused her discretion by questioning witnesses at defendant's bench trial. See *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 21, 16 N.E.3d 763 (considering whether the trial court erred in questioning witnesses during an adjudication hearing under the abuse-of-discretion standard); *People v. Harris*, 384 Ill. App. 3d 551, 560, 892 N.E.2d 1147, 1156 (2008) (rejecting an argument that review was *de novo* and applying an abuse-of-discretion standard when considering whether the trial court's questioning of the defendant meant it improperly assumed the role of an advocate for the State).

¶ 45       The record in this case does not reflect an abuse of discretion by the trial court. Although the court asked several questions of two of the State's witnesses and defendant, who elected to testify on his own behalf, its inquiries are most accurately characterized as attempts to clarify or expand on testimony and elicit the truth. For example, during the testimony of both Guerrero and Chambers, the court asked questions aimed at clarifying two subjects that were the source of some confusion during the witnesses' testimony—the identity of the person or persons who drove the group to Belvidere and the nature and extent of Guerrero's prior contacts with defendant. The court also questioned Guerrero and Chambers regarding how defendant and A.M.G. interacted with one another on the evening in question and A.M.G.'s drinking, subjects that were not fully delved into during either party's examination of the witnesses and that were relevant to the case and the court's decision as the trier of fact.

¶ 46       Additionally, defendant's own testimony on direct examination consisted primarily of flat denials regarding many of the events testified to by the State's witnesses with very limited detail. When questioning defendant, the trial court sought elaboration regarding his version of the underlying events.

¶ 47       Defendant suggests that the trial court did not act impartially, given the number of questions it asked, because it "elicited numerous details about the evening" and because it found him guilty "based in part on answers to [its] own questions." Ultimately, however, the record shows the court primarily asked open-ended questions of all of the witnesses, which prompted them to more fully explain their testimony and the events at issue. The point of any questioning is to bring out information, and the fact that the court's questions elicited details about the relevant events does not suggest bias. We find nothing in the court's questions that indicate its opinion of the witnesses' testimony, that it was biased against defendant, or that it had prejudged the case

before hearing all of the evidence. Moreover, we note that "[a] trial judge does not assume the role of prosecutor merely because [his] questions solicit evidence material to the State's case." (Internal quotation marks omitted.) *People v. Taylor*, 357 Ill. App. 3d 642, 649, 829 N.E.2d 890, 896 (2005); see *In re Maher*, 314 Ill. App. 3d 1088, 1098, 734 N.E.2d 95, 103 (2000) ("The fact that the judge's questions brought out information damaging to respondent does not mean the judge was acting as an advocate.").

¶ 48          Further, we find the cases cited by defendant—*People v. Cofield*, 9 Ill. App. 3d 1048, 293 N.E.2d 692 (1973), and *People v. Rega*, 271 Ill. App. 3d 17, 648 N.E.2d 130 (1995)— are significantly distinguishable from the present case. In *Cofield*, 9 Ill. App. 3d at 1049-50, the trial judge called and examined the State's witnesses, accused a witness of lying, and threatened to have the witness taken into custody. In *Rega*, 271 Ill. App. 3d at 24-25, the judge expressed doubt about the defendant's defense out of the jury's presence and then engaged in a lengthy "textbook cross-examination" of the defendant in front of the jury that was characterized by the reviewing court as "terse, probing, telling, using touches of sarcasm, [and] impeaching by omission on material facts."

¶ 49          The trial court's conduct in the present case was very different from what occurred in either *Cofield* or *Rega*. Unlike the judge in *Cofield*, the judge in the present case did not take over for the prosecutor in calling or examining the State's witnesses or express obvious opinions about witness testimony. Unlike in *Rega*, defendant's trial was a bench trial. Although the court below asked several questions of the witnesses, none of its questioning may be characterized as a "textbook cross-examination."

¶ 50          Under the circumstances presented, we find no abuse of discretion by the trial court. As a result, defendant cannot establish the occurrence of any error with respect to the court's

questioning, let alone a clear or obvious error. Defendant is not entitled to relief under the plain error doctrine.

¶ 51                                    B. Sentencing

¶ 52         On appeal, defendant also argues that the trial court erred by relying on matters outside the record when determining his sentence. Specifically, he contends the court improperly relied on its own outside research involving his out-of-state rape conviction. In response, the State concedes that the court's research into defendant's rape conviction was "in error." However, it contends that the issue has been forfeited by defendant's failure to raise it below and that, in any event, the error was harmless and does not require remand.

¶ 53         "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010). In this instance, defendant failed to contemporaneously object when the trial court stated it "looked up" his prior rape conviction. The record also fails to reflect that in connection with his motion to reconsider, he raised the contention that the court acted improperly by relying on "outside" information at his sentencing. Instead, the record shows only that defendant argued the court placed too much emphasis on his prior conviction because the sentence he received for that offense indicated it was less serious than his current offense. Accordingly, we agree with the State that the issue has been forfeited.

¶ 54         In reply, defendant argues the forfeiture rule should be relaxed or the issue should be considered under the plain error doctrine. To support his contention that forfeiture should be less rigidly applied in this instance, defendant, again, relies on case authority emanating from the *Sprinkle* doctrine. As stated, the forfeiture rule may be relaxed consistent with *Sprinkle* "when a trial judge oversteps his or her authority in the presence of the jury or when counsel has been

effectively prevented from objecting because it would have fallen on deaf ears." (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 612. The present circumstances do not involve the occurrence of any conduct in front of a jury, nor has defendant pointed to anything that suggests the court would have ignored an objection. Again, we find relaxation of the forfeiture rule is unwarranted in this case.

¶ 55       As already discussed, to obtain relief under the plain error doctrine, "a defendant must first show that a clear or obvious error occurred." *Hillier*, 237 Ill. 2d at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* Defendant's arguments on appeal suggest only that he is claiming first-prong plain error, *i.e.*, that a clear or obvious error occurred and the evidence at his sentencing was closely balanced.

¶ 56       "The trial court has broad discretionary powers when selecting an appropriate sentence." (Internal quotation marks omitted.) *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 53, 141 N.E.3d 320. However, "[w]hether the trial court relied upon an improper factor during sentencing is a question of law reviewed *de novo*." *Id.*

¶ 57       "The law is well settled that, exclusive of certain matters of which the court may take judicial notice, the deliberations of the trial judge are limited to the exhibits offered and admitted in evidence and the record made before him in open court." *People v. Rivers*, 410 Ill. 410, 416, 102 N.E.2d 303, 306 (1951). "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." (Internal quotation marks omitted.) *People v. Dameron*, 196 Ill. 2d 156, 171-72, 751 N.E.2d 1111, 1120

(2001).

¶ 58　　　　To support his contention of error in the present case, defendant relies heavily on the supreme court's decision in *Dameron*. There, the court held the trial judge improperly relied on outside sources of information when sentencing the defendant after the judge "spoke at length about social science statistics and vague generalizations about crime he uncovered through his own investigation." *Id.* at 176. We find *Dameron* is factually distinguishable from the present case.

¶ 59　　　　Initially, defendant contends on appeal that the trial court's comments suggest it "looked up the [Maryland] statute" upon which his second degree rape conviction was based and that such action was error. We note, however, that the court's consideration of the Maryland statute would not have been improper. Unlike the challenged material in *Dameron*, the contents of a statute are matters over which a court may take judicial notice. See 735 ILCS 5/8-1003 (West 2020) ("Every court of this state shall take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States."); see also *People v. Johnson*, 2021 IL 125738, ¶ 54, 182 N.E.3d 728 (stating "Illinois courts often take judicial notice of facts that are readily verifiable by referring to sources of indisputable accuracy"). Additionally, "[a] court may take judicial notice, whether requested or not," and "[j]udicial notice may be taken at any stage of the proceeding." Ill. R. Evid. 201(c), (f) (eff. Jan. 1, 2011). Thus, authority existed for the court to consider the Maryland statute upon which defendant's prior rape conviction was based. Further, the court could have done so *sua sponte* and at any stage of the underlying proceedings.

¶ 60　　　　Significantly, here, the trial court did not identify the specific Maryland statute of which it was taking notice or the source of the information about the Maryland statute that it obtained relative to defendant's prior conviction. The court's comments reflect only that it "looked up on the [i]nternet what rape in the second degree is and it reads exactly the same as criminal

sexual assault here in Illinois." Under these circumstances, we cannot say the information acquired by the court came from an official statutory source, *i.e.*, one of "indisputable accuracy." Accordingly, we agree with defendant that error occurred. We disagree, however, with defendant's suggestion that the evidence at his sentencing was closely balanced.

¶ 61 First, the record does not support defendant's contention that the trial court's "outside research" was critical to its sentencing determination. The fact that defendant's criminal history included a prior sex offense felony conviction was a relevant factor for the court's consideration. The court's comments below indicate it was the fact of that prior conviction that the court found significant, and not the results of its research into the elements or factual basis for that offense. See *People v. Mattingly*, 180 Ill. App. 3d 573, 580, 536 N.E.2d 257, 261 (1989) ("[W]here it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required."); see also *In re T.R.*, 2019 IL App (4th) 190529, ¶ 98, 146 N.E.3d 692 ("Although a judge errs in considering facts outside the record, that error is harmless when a reviewing court can safely conclude that consideration of the facts outside the record did not affect the result." (Internal quotation marks omitted.)).

¶ 62 Second, defendant also argues the trial court "discounted" evidence he presented in mitigation. He contends that most of his prior convictions were for misdemeanor or traffic offenses and his two felony convictions were 20 to 30 years old. To the extent defendant argues that the court should have found these considerations mitigating, we disagree. The record shows defendant had a lengthy criminal history. Although most of that history involved the commission of misdemeanor and traffic-related offenses, it nevertheless reflects repeated and consistent contacts with the criminal justice system over a 30-year period. As noted by the court, defendant was being

sentenced for a sex offense and had a prior conviction for a sex offense. As recently as 2019, defendant also had convictions for contributing to the delinquency of a minor and battery. Defendant's PSI further indicated that he "displayed criminal thinking" and failed to take accountability for his past actions. Given these facts, the court did not err by viewing defendant's criminal history as aggravating and warranting the imposition of a lengthier sentence.

¶ 63        Defendant further argues that evidence in mitigation included that he "was steadily employed, he supported his family, went to church, *** did volunteer work" and that A.M.G. suffered no lasting physical harm from the offense. To support these contentions, defendant cites only his counsel's arguments at his sentencing. We note that the PSI showed defendant was steadily employed, at least in the two years prior to his arrest, and that he reported that he attended church and volunteered with church activities. The evidence is dubious, however, with respect to his claim that he "supported his family." Although evidence showed defendant's daughter and his girlfriend resided with him for a period of time prior to his arrest, it fails to show any particular manner in which defendant provided "support" to any family member. Additionally, the PSI showed that defendant had otherwise fathered eight children, owed $30,000 in unpaid child support, and did not know the name of his youngest child. Finally, while A.M.G. may have suffered no lasting physical harm from the underlying events, the record was clear that she reported suffering significant emotional and mental harm as a result of defendant's actions. Given these facts, we find the record does not support any suggestion by defendant that the evidence in mitigation outweighed the aggravating evidence or was closely balanced in this case.

¶ 64        Here, defendant has failed to establish the occurrence of plain error. As a result, he also cannot establish his entitlement to a remand for resentencing.

¶ 65                                III. CONCLUSION

- 22 -

¶ 66        For the reasons stated, we affirm the trial court's judgment.

¶ 67        Affirmed.

*People v. Holland*, **2023 IL App (4th) 220384**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 20-CF-2041; the Hon. Debra D. Schafer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Maria A. Harrigan, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Connor Goetten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |